UNITED STATES of America, Appellee,

v.

Richard Alan CEPULONIS, Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Francis David LOVELL, Defendant-Appellant.

Nos. 74–1396, 74–1397.

United States Court of Appeals, First Circuit.

Argued Sept. 8, 1975.

Decided Jan. 30, 1976.

Certiorari Denied June 1, 1976 in No. 74–1396.
See 96 S.Ct. 2231.
Certiorari Denied June 7, 1976 in No. 74–1397.
See 96 S.Ct. 2630.

Robert W. Harrington, Boston, Mass., by appointment of Court, with whom Judith E. Diamond and Harrington & Gormley, Boston, Mass., were on brief, for Richard A. Cepulonis, appellant.

George V. Higgins, Boston, Mass., by appointment of Court, with whom Frank C. Crowley and George V. Higgins, Inc., Boston, Mass., were on brief, for Francis David Lovell, appellant.

Edward J. Lee, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., were on briefs, for appellees.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and THOMSEN, Senior District Judge.*

* From the District of Maryland, sitting by designation.

LEVIN H. CAMPBELL, Circuit Judge.

After a jury trial appellants Lovell and Cepulonis were convicted of aggravated bank robbery, 18 U.S.C. § 2113(d). Each appeals, complaining of a number of evidentiary and procedural rulings by the district court. We affirm the convictions.

We state the facts initially only in broad outline, leaving it until later to flesh out the details in connection with particular claims. A Woburn branch of the Suburban National Bank was robbed of $17,000 on August 9, 1973, by three masked men carrying automatic rifles. The three men escaped only after a high-speed police chase, during which shots were fired both at the police and at a passing motorist whose car crashed as a result.

On September 15, 1973, the FBI arrested Lovell and Cepulonis in New York —Lovell, at about noon in the Skyway Motel near Laguardia Airport; Cepulonis, later in the day at the Holiday Inn in Manhattan. On the fourteenth, agents had learned from an unidentified informant that the two men might be found at the Skyway Motel. At the time, a warrant was outstanding for Cepulonis' arrest for unlawful flight from prosecution in another case, and the agents suspected both men of participation in the August 9 robbery. Accordingly, agents began surveillance on the morning of the fifteenth of a room at the Skyway that they believed one or both men might be occupying. At about noon Lovell emerged accompanied by a woman. Agents stopped him in the corridor, frisked him for weapons, and arrested him when they discovered a handgun in his waistband.

A search of Lovell's person at the time of his arrest produced a set of car keys and approximately $300 in cash, including a number of five-dollar bills of an unusual type that had been taken in the robbery. A search of the suitcase and briefcase that Lovell had been carrying produced two loaded revolvers and a scrap of paper bearing the name of the Holiday Inn. Finally, a close view of Lovell's car in the Skyway parking lot revealed a shotgun, partially hidden under the seat, which the agents recovered by using Lovell's keys to enter the car.

After satisfying themselves that Cepulonis was not at the Skyway the agents turned their attention to the Holiday Inn on the basis of the scrap of paper bearing its name discovered during Lovell's arrest. There the agents learned where Cepulonis was staying, and as they had done earlier at the Skyway, put the room under surveillance. At about 7:00 P.M. Cepulonis emerged and was placed under arrest for unlawful flight. At the time of his arrest, Cepulonis expressed concern for his wife and child, and because of this the agents permitted him to walk, handcuffed, back to the door of his room and ask to be readmitted. When a woman opened the door, the agents entered and searched for other persons, but found only a young child. They then requested, and by their account received, permission to search for weapons. This search produced, among other things, handguns, ammunition and $2558 in cash. A subsequent search of Cepulonis' car yielded, in addition, an M–16 rifle.

Two months later James Guimond, arrested on other charges in Massachusetts, admitted to the FBI that he had participated in the August 9 robbery along with Cepulonis and Lovell. He revealed that after the robbery all three men had lived in a trailer park in Indianapolis and that he had stored a green footlocker there. Using the name Guimond provided, "Joseph Macklin, No. 217," FBI agents were able to secure the trunk and the MP 44 assault gun it contained.

Cepulonis, Lovell and Guimond were indicted for the robbery, and Guimond pleaded guilty. Before trial the district court denied motions to suppress the fruits of all the arrests and searches, with the exception of the M–16 rifle found in the search of Cepulonis' car. The court also denied a motion to sever the appellants' trials. The trial lasted

five days, the Government's case consisting chiefly of Guimond's testimony and of the items seized during the arrests and after Guimond's confession. After the jury found appellants guilty, the court sentenced Cepulonis and Lovell to twenty-five years' imprisonment, and Guimond to eight.

## I.

We deal first with the court's rulings on the motions to suppress. The warrantless searches and seizures approved by the court and challenged here can be categorized as follows: (1) the search of Lovell's person and effects in the Skyway Motel, (2) the search of Lovell's car in the Skyway parking lot, (3) the search of Cepulonis' room at the Holiday Inn; and (4) the seizure of the green footlocker in Indianapolis. We consider each in turn.

## A

■ With respect to the searches attending Lovell's arrest, if the FBI agents acted properly in discovering the handgun in Lovell's waistband, they also acted properly in arresting him for its possession in light of their awareness of his criminal record, see *Adams v. Williams,* 407 U.S. 143, 148–49, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); and if Lovell's arrest was proper, the full search of his person and of the two cases he was carrying was in turn justifiable as incident to his arrest, see *United States v. Eatherton,* 519 F.2d 603, 609–11 (1st Cir. 1975). The issue before us is accordingly limited to whether the agents had adequate cause to stop and frisk Lovell when they saw him leaving his room at the Skyway.

■ We hold that the stop and frisk were valid under the standards of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). While the agents, as all agree, lacked probable cause to arrest Lovell as he approached them in the corridor outside his room,[1] they were able to point to "specific and articulable facts"

that reasonably warranted stopping him for questioning and frisking him for weapons. *Id.* at 21, 88 S.Ct. 1868.

On September 14, the FBI learned that the Massachusetts State Police had received a tip from an unidentified informant that Lovell and Cepulonis were to meet a friend of Lovell's, Mary Cosgrove, at the Skyway Motel that evening. At the time Cepulonis was wanted on a fugitive warrant, both men were known to have been convicted previously of felonies involving violence, and both were suspected of participation in the August 9 robbery. Agents arrived at the Skyway early the next morning, examined the registration cards for the night of the fourteenth, and discovered a card bearing the name of Frank Patrone and listing an Ohio address and an Ohio auto registration. A check of FBI records revealed that the date of birth and general physical description on Patrone's Ohio driver's license matched Lovell's. From this the agents inferred that Patrone was in fact Lovell, and on this basis staked out the room registered to Patrone. When a couple came out of the room later that morning, Agent Holliday, who was in charge, recognized Lovell from an FBI photograph.

At this point the agents had sufficient information to justify questioning Lovell in the corridor. They knew that Lovell, who had a prior felony conviction, had used an alias in obtaining an Ohio driver's license and in registering at the Motel. They also had corroboration of the otherwise unsubstantiated tip that Lovell and Cepulonis might be found at the Motel, and thus some basis for believing that Cepulonis, for whom a fugitive warrant was outstanding, might be in the room Lovell had left. Given the circumstances, failure to have investigated further would "have been poor police work indeed:" *Ballou v. Commonwealth,* 403 F.2d 982, 985 (1st Cir. 1968), *quoting Terry, supra,* 392 U.S. at 23, 88 S.Ct. 1868. And in light of Lovell's prior felo-

---

1. This was not a situation where there was ample opportunity to procure a warrant, as in

*Niro v. United States,* 388 F.2d 535 (1st Cir. 1968).

ny conviction, the warrant charging Cepulonis with flight from prosecution in an armed robbery, and the corroborated suspicion that Lovell and Cepulonis had been together, it was also reasonable to conduct a limited pat-down search for weapons. The agents had grounds to believe that Lovell might be armed and dangerous and that is was necessary "to take swift measures to discover the true facts and neutralize the threat of harm if it materialized. . . ." 392 U.S. at 30, 88 S.Ct. at 1884.

### B

After discovery of the motel registration card filled in by Lovell in the name of Patrone, the FBI had located the automobile registered to Patrone in the Skyway parking lot and had placed it under surveillance. After the arrest, the agent conducting the surveillance, Agent Jules, approached the car for a closer look. Through the window he saw a sawed-off shotgun protruding from beneath the front seat. While the shotgun was partially covered by a brown paper bag, he could see that the barrel was broken, and that two shells were in the chamber. Using the keys seized during Lovell's arrest, he then opened the door and seized the weapon.

Agent Jules unquestionably had probable cause to seize the shotgun when he saw it in plain view in the automobile of a convicted felon, and we hold that he acted properly in entering the car to retrieve the weapon without first obtaining a warrant.[2] Although the agents had secured Lovell's keys, there was nothing to indicate that a second set did not exist. The agents had not arrested Mary Cosgrove and were still unsure of Cepulonis' whereabouts. They could not be certain, therefore, that seizure of Lovell's keys immobilized the vehicle. Moreover, a legitimate concern for public safety counselled against leaving the car, with a loaded shotgun visible through the window, unguarded in the Motel

parking lot and "vulnerable to intrusion by vandals." *See Cady v. Dombrowski,* 413 U.S. 433, 448, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Under the circumstances the agents were faced with a choice whether to seize and hold the car while securing a warrant or to carry out an immediate warrantless search. Given probable cause to seize the shotgun, we have no doubt that Agent Jules' decision to enter the car immediately was reasonable under the fourth amendment. *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *United States v. Ellis,* 461 F.2d 962, 966 (2d Cir.), *cert. denied,* 409 U.S. 866, 93 S.Ct. 162, 34 L.Ed.2d 115 (1972).

### C

Invoking "one of the specifically established exceptions to the requirements of both a warrant and probable cause," *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973), the district court approved the search of Cepulonis' room at the Holiday Inn following his arrest as a valid consent search. Whether a search is justified by voluntary consent "is a question of fact to be determined from all the circumstances," *id.* at 248–49, 93 S.Ct. at 2059, and the district court's findings will not be overturned unless "clearly erroneous," *United States v. Bradley,* 455 F.2d 1181, 1185 (1st Cir. 1972), *aff'd on other grounds,* 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973). We perceive no clear error.

Cepulonis was arrested in the corridor outside his room at the Holiday Inn at about 7:00 P.M. on September 15. Informed of his rights, Cepulonis requested to speak to a lawyer and then expressed concern for his wife and child, who he indicated were still in the room he had left. Agent Marble, one of the six agents, permitted him to return to the room, knock on the door, and request to be admitted. At the time, he was hand-

---

2. Although we find that independent exigent circumstances are present in this case, *see* text *infra,* we note that such circumstances may no longer be necessary to uphold the search of an automobile. *Haefeli v. Chernoff,* 526 F.2d 1314, 1318 & n. 9 (1st Cir. 1975).

cuffed and surrounded by the agents, two of whom carried shotguns. When a woman opened the door, the agents entered the room and immediately searched for persons who might be dangerous but found only the woman and a young child. Agent Marble then asked if the room contained any weapons, to which, according to Marble's testimony, Cepulonis replied, "No, go ahead, search" or words to that effect. The agents then conducted a more extensive search, finding two loaded pistols, ammunition for an M–16 rifle, three armored vests, and (in a shaving kit) $2558 in cash.

We find no clear error in district court's finding that Cepulonis consented both to the agents' entering the room and to their search for weapons. Whether there was consent could have gone either way, given the ambiguity of Cepulonis' expression of concern and the coerciveness present in the handcuffs and the weapons held by the agents, but we are not "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), *quoted in Leavitt v. Howard,* 462 F.2d 992, 996 (1st Cir.), *cert. denied,* 409 U.S. 884, 93 S.Ct. 175, 34 L.Ed.2d 140 (1972). Cepulonis was acquainted with violence and had confronted the police before; he was less likely than most to be intimidated by the agents' show of force. Being informed of his rights "put him on notice that he [could] refuse to cooperate . . . ." *Gorman v. United States,* 380 F.2d 158, 164 (1st Cir. 1967). As for the ambiguity of the expression of concern, we think this is mitigated by the clear implication of Cepulonis' conduct in walking back to the door, knocking, and asking readmittance; Cepulonis could hardly have expected the agents to remain outside while he went into the room. Finally, the incriminating contents of the room do not necessarily belie consent: "A defendant may believe that [a] search is ultimately inevitable whether he consents or not. In such circumstances a suspect might well feel he is better off to consent than to oppose." *Leavitt, supra,* at 997 (footnote omitted).

■ Once entry had been accomplished, the agents' conduct within the room was clearly justified. They were entitled to assure themselves that no confederates were in the room who might be armed and dangerous, *see United States v. Blake,* 484 F.2d 50, 56–57 (8th Cir. 1973), *cert. denied,* 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974), and the finding of consent to search for weapons is directly supported by Agent Marble's testimony.

### D

■ The district court also found that the recovery and search of the green footlocker that Guimond had left at the Indianapolis trailer camp was consented to by Guimond. The court relied on the rule that one having joint access to or control over property for most purposes may consent to its inspection by law enforcement officials. *United States v. Matlock,* 415 U.S. 164, 171 & n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

On November 16, 1973, Guimond admitted to Agent Joyce of the FBI that he had participated in the robbery and had later rented a trailer in Indianapolis with Cepulonis and Lovell. He explained that the others had left about a week before he did, leaving him with the trunk and its contents; that he had upon his own departure left the trunk with a Joseph Rieu; and that he had authorized Rieu to release the trunk to anyone who spoke the words, "Joseph Macklin, No. 217." Joyce's testimony to this effect was corroborated by the testimony of Rieu and the trailer park manager, Goldie Pierson. Guimond's access to the trunk was plainly sufficient for him to consent to its inspection; and his consent was explicit in his disclosure of the code words to Agent Joyce.

### II

Appellants claim that it was error to permit Richard Vidito to identify each of

them in court, since the identifications were incurably tainted by a suggestive photographic display that the FBI had shown Vidito before trial. We do not agree.

Vidito testified that Guimond, an old acquaintance, had brought two men, known to Vidito only as Cepi and Frankie, to Vidito's apartment the night before the robbery. There, with Vidito present much of the time, plans were laid and weapons assembled for the robbery. The next day Vidito saw Cepi and Frankie leave in the morning. In the late afternoon when he returned to the apartment he found them there again. The two men admitted robbing the bank and, after Cepi had forced Vidito at gunpoint to drive him to an area where he could recover the weapons and money, counted the money in Vidito's presence. Vidito admitted on cross-examination that he had consumed substantial amounts of beer and whisky and some marijuana while with the others on the night of August 8, and a large quantity of beer before seeing them again on August 9.

In February 1974, three months after Guimond began talking to the FBI, agents located and interviewed Vidito, who was then in Florida. He was shown a group of nine photographs, three of which portrayed Cepulonis, Lovell and Guimond. Of the six other photographs, five were mug shots of people in custody outside of Massachusetts and the sixth was a snapshot of a man with heavily tattooed forearms. Three of the mug shots bore dates in September and October 1973 when, appellants say, Vidito knew that Cepulonis and Lovell were at large. According to the agent who presented the display, Vidito picked out the photo of Cepulonis without hesitation as representing the man he had known as Cepi, and stated with relative certainty that the photo of Lovell looked like Frankie. The trial identifications were similar: Vidito stated that he "believed" Cepulonis was Cepi, and that Lovell "looked like" Frankie.

The district court acted properly in allowing the in-court identifications. Even if we were to accept the claim of unnecessary suggestiveness in the photographic display, an issue we do not decide, "there was clear and convincing evidence of an independent basis for the in-court identifications." *United States v. Butler,* 426 F.2d 1275, 1276 (1st Cir. 1970), *citing United States v. Johnson,* 412 F.2d 753, 754 (1st Cir. 1969). Vidito had an opportunity to observe appellants for substantial lengths of time over a period of two days at his apartment. He had a further opportunity to view Cepulonis while the two were together in an automobile. His association with the suspects was far more extensive than the brief exposure during a bank robbery that has been found to suffice, in combination with other factors, in other cases. *Allen v. Moore,* 453 F.2d 970, 975 (1st Cir. 1972); *United States v. Butler, supra,* at 1276.

Vidito's powers of observation may, to be sure, have been less than normal in light of his heavy drinking on both days. However, the evidence falls short of showing that he was intoxicated throughout his association with the accused. His testimony was that he began drinking after he had met them, not before; there was no evidence that he was intoxicated the next morning when he saw them leaving the apartment; and in the afternoon he was sufficiently sober to drive an automobile and to follow the directions provided by Cepulonis. More importantly, Vidito's identification testimony was fully corroborated by Guimond, who not only identified the others independently and with greater certainty, but also confirmed their presence at Vidito's apartment on the night before the robbery and on the following evening when the money was counted. There was no evidence, such as a prior failure to identify, to suggest that Cepulonis and Lovell were not, in fact, the men whom Vidito testified to having seen. Finally, Vidito's identification was, if anything, more tentative at trial than in the photographic identification

procedure. "[T]he qualified nature of the identification itself provid[es] a persuasive indication that the police conduct was without significant effect." *United States v. Eatherton,* 519 F.2d 603, 609 (1st Cir. 1975). In sum, considering the totality of the circumstances, we see no realistic possibility that irreparable misidentification could have resulted from the pretrial photographic display. *Id.*

## III

■ Appellants challenge the admission of evidence which, they say, was designed less to prove their commission of the crime charged than to show that they were vicious and dangerous men. We have said, with respect to similarly challenged evidence, "[i]f its only value was to show appellant's bad character or other criminal activity, it would be inadmissible under familiar principles . .," *United States v. Eatherton, supra,* at 611, but if it tends to prove the offense charged, "[t]he test of admissibility requires balancing the prejudicial potential of the evidence against its probative value, and that task is committed primarily to the trial court. . . ." *Id.* Applying these principles, we find appellants' contentions without merit.

Evidence was admitted that appellants fired at a police officer and at a passing motorist in the course of their getaway after the robbery. Appellant Cepulonis argues that this evidence was both unnecessary, in that there was ample evidence that the robbers had threatened employees and fired shots within the bank, and highly prejudicial. The Government counters that the evidence not only was relevant to prove aggravation and intent, but corroborated the testimony of Vidito and Guimond linking appellants to the crime, since both witnesses had testified that· it was part of the plan to fire at civilians as a means of distracting the police. We find no abuse of discretion, given especially the central role of Vidito's and Guimond's testimony and appellants' intensive attack on their credibility.

■ Nor did the court abuse its discretion in admitting the shotgun that had been recovered from Lovell's car after his arrest. Vidito and Guimond testified that it was among the weapons assembled in preparation for the crime, and although the weapon was not used in the actual robbery, its recovery corroborated their testimony.

■ Turning finally to the decision to admit the money found in the search on Cepulonis' person and hotel room at the time of his arrest, we find no error. Part of the money taken in the robbery had been in silver certificates, mostly in denominations of five dollars, and there was testimony that in 1973 such certificates were not often seen in normal cash. There was evidence that after the robbery Cepulonis had a bunch of five dollar bills, of which he said all or part were silver certificates, and that Lovell had been carrying a number of five dollar silver certificates when he was arrested. The money seized during Cepulonis' arrest contained five such certificates, and·the jury was entitled to infer that the certificates were ones taken in the robbery.[3]

## IV

■ Appellants' remaining claims are without merit. The court acted properly in denying the motion to sever. Since both appellants were charged with having participated in the same offenses they could be tried together under Fed.

---

**3.** Appellants' objections to admission of the MP 44 machinegun found in the Indianapolis footlocker and a bandolier of ammunition seized during the search of Cepulonis' hotel room are plainly without merit, as there was evidence that both were used in the robbery.

Cepulonis' objection to exclusion of testimony by Guimond on his possession of an M–16 rifle after the robbery is of little force. The court was legitimately concerned with the possibility of confusion between that weapon and another M–16 that it had suppressed on fourth amendment grounds. The matter was of marginal significance, and appellants were given broad latitude in cross-examining Guimond.

R.Crim.P. 13, and would be entitled to severance only for demonstrable prejudice. Fed.R.Crim.P. 14; *see United States v. Martinez,* 479 F.2d 824 (1st Cir. 1973); *King v. United States,* 355 F.2d 700 (1st Cir. 1966). Here, there was no prejudice: nearly all of the evidence was admissible against both men, and there was no inconsistency of defense. *Cf. United States v. Clayton,* 450 F.2d 16 (1st Cir. 1971), *cert. denied* 405 U.S. 975, 92 S.Ct. 1200, 31 L.Ed.2d 250 (1972). The court also acted properly in refusing to continue the trial until after Guimond's sentencing. The jury was made aware that Guimond, might be influenced by hope of more lenient punishment, both by full investigation of his position on cross-examination and by careful instructions by the court. *See United States v. Scheffer,* 463 F.2d 567, 572 (5th Cir.) *cert. denied,* 409 U.S. 932, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972).

In view of the evidence that the bank had federally insured deposits, the challenge to federal jurisdiction is contrary to settled law. *See, e. g., Way v. United States,* 268 F.2d 785, 786 (10th Cir. 1959); *cf. Perez v. United States,* 402 U.S. 146, 154–55, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). Finally, in view of Guimond's testimony and our affirmance of the district court's evidentiary rulings challenged here, there was ample evidence to support the court's refusal to grant the motion for judgment of acquittal.

*Affirmed.*