# United States Court of Appeals
## For the First Circuit

No. 05-1312

UNITED STATES OF AMERICA,

Appellant,

v.

CHARLES WINSTON, JR.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Torruella, Circuit Judge,
Cyr and Stahl, Senior Circuit Judges.

John-Alex Romano, Attorney, Appellate Section Criminal Division, United States Department of Justice, with whom Michael J. Sullivan, United States Attorney, Ariane D. Vuono and Thomas J. O'Connor, Assistant United States Attorneys, were on brief, for appellant.
David P. Hoose, with whom Katz, Sasson, Hoose and Turnbull, was on brief, for appellee.

April 21, 2006

**TORRUELLA, Circuit Judge.** This is an interlocutory appeal by the government under the provisions of 18 U.S.C. § 3731 from an order of the district court suppressing evidence obtained pursuant to a search warrant. For the reasons stated hereinafter, we reverse. The district court concluded that the search warrant was based on information that was illegally obtained by government agents incident to defendant Charles Winston's ("Winston") arrest. Specifically, the court found that the observation by the arresting officers of a certain amount of cash in Winston's nightstand, as well as of a safe located in the basement of his house, resulted from an unreasonable search in violation of Winston's Fourth Amendment rights. Therefore, it found that this information could not be used to establish probable cause in support of the issuance of a valid search warrant. The court thus proceeded to invalidate the search warrant for lack of probable cause and consequently suppressed the evidence discovered thereunder, namely, $58,000 in cash, a scale with white powder residue, a hand gun, and ammunition.

## I. Background

Pursuant to an investigation of a large-scale drug trafficking organization, federal agents obtained an indictment of Winston along with about twenty-five others on October 14, 2003. The indictment charged Winston with distributing cocaine on December 16, 2002 and with being part of a conspiracy to distribute

cocaine between July 2002 and February 2003. Also on October 14, 2003, a warrant issued for Winston's arrest.

On October 15, 2003, agents went to Winston's house to arrest him. Some of the agents had previously seen Winston, his girlfriend, and his distinctive blue BMW. One of the agents had arrested Winston about two weeks earlier for possession of a handgun. One of Winston's codefendants had informed the agents that he had sold Winston two handguns and a bullet-proof vest.

Arriving at Winston's house, a duplex, agents saw Winston's car in the driveway of his house. The agents did not notice any other cars near the house. The agents surrounded the house and surveilled it for about an hour and a half, hoping that Winston would exit. During this time, the agents did not observe any activity in the house.

Agents then knocked on the door to Winston's house, the right half of the duplex. Winston's girlfriend answered the door, but the agents present did not know who she was. The agents asked her who owned the blue BMW. She denied knowing the owner of the car and suggested that the agents inquire next door. The agents did so, but no one responded.

About five minutes later, agents knocked again on the door to Winston's house. In the meantime, Agent Burns had walked around the house to the vicinity of the front door. When Winston's

girlfriend opened the door, Agent Burns recognized her as Winston's girlfriend. The agents then pushed past her into the house.

One agent shouted "Chuck," and Winston immediately responded from upstairs "up here." Agents went up the stairs with guns drawn. They saw Winston's child near the top of the stairs and saw Winston in the hallway talking on a cell phone. This occurred within twenty seconds of entering the home. Agents ordered Winston to drop the phone. Winston complied, and agents put him in custody without a struggle. Agents did not conduct a protective sweep on the second floor. During this time, Agent Burns went upstairs to bring the child downstairs and out of harm's way.

After handcuffing Winston with his hands behind his back, agents asked him for identification. Winston told them that it was in the nightstand in his bedroom. Because of clothes piled in the bedroom, the agents could not find the nightstand so they brought Winston into the bedroom and asked him again. Winston pointed to the nightstand with his shoulder. The agents opened the drawer in the nightstand to find Winston's wallet on top of a large amount of cash.

Trooper Martin had entered the house at the same time as the group of agents who proceeded to the second floor, but he moved immediately through the living room and kitchen until he came upon a set of interior stairs which lead to the basement of the house.

Thereupon he proceeded down the stairs into the basement for the purpose of securing that area. Upon reaching the basement floor he observed a furnace, and behind it an object covered by a blanket. He proceeded to remove the blanket and discovered a safe which measured approximately twenty-four inches in height by seventeen inches in width by twenty seven inches in depth. After having brought the child to the first floor, Agent Burns followed Trooper Martin into the basement where Trooper Martin showed him the safe. These two agents went back upstairs and, in Winston's presence, informed the other agents of their discovery of the safe. Winston then stated, "That's my safe."

## II. Protective Sweep of the Basement

The Fourth Amendment protects individuals from unreasonable searches and seizures. Maryland v. Buie, 494 U.S. 325, 331 (1990). Generally, the search of an individual's house without a search warrant is unreasonable and violates the Fourth Amendment. Id. Exceptions to this general rule arise when the benefits to the public interest outweigh the individual's privacy right. Id. One such exception is a protective sweep conducted in conjunction with the arrest of an individual in his home. Id. at 327.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Id. To prevent law enforcement

-5-

from abusing the protective sweep by using it as a pretext for searching an individual's home, the Supreme Court has limited its use. First, law enforcement officers conducting the sweep must have a reasonable suspicion of danger: "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 334 & n.2. The reasonable suspicion standard is "considerably less demanding than the level of proof required to support a finding of probable cause," United States v. Martins, 413 F.3d 139, 149 (1st Cir. 2005), but must be based on more than an unfounded speculation, United States v. Cook, 277 F.3d 82, 85 (1st Cir. 2002). Second, the scope of a protective sweep must be limited to its purpose. The sweep "may extend only to a cursory inspection of those spaces where a person may be found." Buie, 494 U.S. at 335. Additionally, the duration of the sweep must be "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335-36.

The district court in this case held that the protective sweep violated the Fourth Amendment. We review the district court's factual findings for clear error. United States v. Palmer, 203 F.3d 55, 60 (1st. Cir. 2000). We review de novo the

constitutional question of whether the protective sweep violated the Fourth Amendment.  Id.

## A.  Reasonable Suspicion

The district court found that the agents did not have a reasonable suspicion to believe that a dangerous person could be in the basement.  The government contests this finding and puts forth a number of facts to support a finding of reasonable suspicion. First, the agents had information to believe that Winston was armed and dangerous and possibly with armed and dangerous cohorts. Winston was indicted, along with twenty-five others, for distribution of cocaine as part of an investigation of a large-scale cocaine trafficking organization.  One of the other defendants informed agents that he had sold Winston two handguns and a bullet-proof vest.  One of the agents present had also previously arrested Winston after a traffic stop for possession of a handgun.  Second, the government finds significant that Winston's girlfriend initially denied having knowledge of Winston's car. From this deception, the government argues that a reasonable agent could believe that the purpose of the deception was to gain time to allow Winston and/or his cohorts to hide, exit the house through another door or window, or prepare an ambush.  Third, the government notes that when agents called out Winston's name, Winston responded "up here" from the second floor.  The government found it unusual that Winston responded so casually from the second

floor when agents forcibly entered his house and argues that a reasonable agent could believe that Winston's unusual response was part of a scheme to escape or to allow others in the drug organization to escape or ambush the agents.

In response, Winston argues that the circumstances would lead agents to believe that no others were present in the house. First, Winston notes that agents surveilled the house for an hour and a half and, during this time, saw no indication of anyone's presence in Winston's house. However, since Winston, his girlfriend, and their child were in the building but unobserved, others could easily have been in the home. Next, Winston finds significant that an agent testifying at the suppression hearing could not recall if there were other cars parked in Winston's driveway or near Winston's home, implying that there were no other cars and thus no sign of other people being present in Winston's house. Winston argues that if cars were present the agent would have noticed them and would have been able to recall this fact. We refuse to ascribe such meaning to the agent's failure to recall whether cars were present, especially given the lack of other relevant information. Finally, Winston points out that when the agents entered the house, they did not see or hear any evidence of another person. We do not find this highly relevant since the purpose of a protective sweep is to protect agents from concealed threats.

We find that, based on the information presented above, the agents had a reasonable suspicion to believe that a dangerous person could be in the basement. Underlying a protective sweep is the "'risk of danger in the context of an arrest in the home' due primarily to the reality that there may be 'unseen third parties in the house.'" United States v. Lawlor, 406 F.3d 37, 41 (1st Cir. 2005) (quoting Buie, 494 U.S. at 333, 336). Winston was a potentially dangerous drug dealer who had recently purchased a bullet-proof vest and firearms and had numerous, potentially armed and dangerous cohorts. This risk was compounded by the deceptive actions of Winston's girlfriend, which gave any potential occupants inside the house five minutes to conceal themselves or prepare an ambush. Further, given that Winston knew that agents had forcibly entered his house, his casual response inviting them upstairs was unusual. One would expect Winston either to evade the agents or to surrender to them by coming downstairs or responding that he was on his way down. His casual, inviting response could lead a reasonable agent to believe that it was part of a scheme to lead the agents away from the basement because others were hiding there waiting to escape or launch a surprise attack on the agents. "The fact that the sweep revealed that there was no person [in the basement] has no bearing on whether [agents were] justified in conducting the sweep in the first place." Id. at 42 n.5. We think that a reasonably prudent agent could believe "that there was a

distinct possibility that a man was hiding in the [basement]." Martins, 413 F.3d at 150. When agents arrest an armed criminal with known cohorts in his home, they put themselves in a dangerous situation and must be able to protect themselves. In these situations, the experienced perceptions of law enforcement agents deserve deference and constitute a factor in our reasonable suspicion analysis. Id. at 150 & n.4.

## B. Scope

Additionally, the district court found that the scope of the sweep was excessive because agents immediately arrested Winston, and agents could have protected themselves by guarding the top of the stairs. This finding, however, begs the point. Obviously, the agents had the right to protect themselves not only from Winston but from all other circumstances reasonably within the scope of the dangers they were facing, i.e., an arrest involving a member of a drug organization with multiple constituents, not all of whom had been accounted for, who were likely to be armed, as Winston was, in a setting which presented an opportunity for ambush or similar violent conduct against the arresting officers.

The scope of the protective sweep in this case, in both location and duration, was within the bounds set forth by the Court in Buie. Officers may make only "a cursory inspection of those spaces where a person may be found." Buie, 494 U.S. at 335. Here, agents walked immediately through the first floor and basement and

-10-

moved a blanket covering a space large enough for a person to hide. We find that their actions constituted a limited and cursory inspection.

Winston argues that the agents could have protected themselves by guarding the top of the basement stairs. As judges trained in the law, and not in apprehending suspects, we cannot determine in this situation how the agents could have gone about protecting themselves, but it does not seem logical or reasonable that given the circumstances previously explained, the agents would leave such an obvious hiding place, from which harm could be dispensed, unsecured. Even if Winston were correct, the validity of a protective sweep "does not turn on the availability of less intrusive investigatory techniques." United States v. Sokolow, 490 U.S. 1, 11 (1989).

Winston also notes that the agent did not descend cautiously into the basement and that agents did not conduct a protective sweep of the second floor, suggesting that the agents did not actually fear for their safety and that the protective sweep was merely a pretext to search Winston's house. We do not agree with Winston that these particular choices by the agents necessarily indicate that the sweep was pretextual. An agent could determine that it would be safer to move silently and swiftly into the basement instead of announcing his presence. Further, agents need not coordinate their intentions to conduct a protective sweep.

-11-

The validity of a protective sweep conducted by the agent on the first floor is not negated by the separate decision of agents on the second floor that a protective sweep is not there necessary. Regardless, the agents' subjective intentions are not relevant as long as the protective sweep was objectively reasonable. Lawlor, 406 F.3d at 43 n.8 (citing Whren v. United States, 517 U.S. 806, 813 (1996)). Furthermore, we are not here to second guess the agents as to how to conduct a protective sweep, for as stated, we are not qualified to do so nor is that within the scope of our judicial duties. We are able, however, to pass upon whether their actions were objectively reasonable given the circumstances and constraints within which they operated. We believe they were.

The duration of the sweep must be "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Buie, 494 U.S. at 335-36. The facts show that Winston's house was small and that Trooper Martin moved quickly into the basement. After arresting Winston, Agent Burns went into the basement to inform Trooper Martin of the arrest, and all agents departed. There was no evidence that the agents lingered longer than necessary to arrest Winston.

## C. Statement of Ownership

The district court also suppressed Winston's statement admitting his ownership of the safe, because it arose from the

illegal observation of the safe. Given our validation of the safe's discovery and Winston's failure to otherwise contest this statement on appeal, we conclude that this admission was also improperly suppressed.

### III.  Consent to Search the Nightstand

Another exception to the search-warrant requirement is a search by consent. United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999). In order to establish this exception, "the government must prove valid consent by a preponderance of the evidence." Id. To be valid, a consent to search must of course be voluntary. Id. The consent may be express or inferred from conduct. United States v. Miller, 589 F.2d 1117, 1130 (1st Cir. 1978) (finding defendant's unlocking of a suitcase to be implied-in-fact consent for officers to search the suitcase). "The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search." Id. We review the district court's findings on voluntariness and consent for clear error. Id. We will uphold the district court's finding as long as it is "fairly supported" by the evidence. United States v. Laine, 270 F.3d 71, 75 (1st Cir. 2001).

The district court tersely found that Winston did not consent to the search of the nightstand that led to the retrieval of his wallet and the discovery of the cash: "His indication in response to questioning of where his wallet could be found cannot

-13-

be construed as a consent to search." Clearly, Winston did not explicitly consent to a search of the nightstand, but the government argues that Winston's actions amounted to an inferred consent or an implied-in-fact consent.

Winston points out several factors that weigh against a finding of consent: agents forced their way into Winston's home, approached him with weapons drawn, ordered him to drop his cell phone, handcuffed him with his hands behind his back, and did not read him Miranda warnings. However, it is inherently reasonable for the agents to ask Winston for identification to verify his identity. See Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.").

The facts clearly support a conclusion to the effect that Winston consented to the search of the nightstand. Upon being asked for verification of his identity, he verbally indicated that his wallet was in the nightstand in the bedroom. The agents could not immediately locate the nightstand in the bedroom, so they escorted Winston into the bedroom. When asked again for the location of his identification, he indicated with a shoulder movement in the direction of the nightstand. While the agents did not explicitly ask for permission to open the drawer to retrieve Winston's identification, the circumstances described would

-14-

reasonably lead the agents to conclude that Winston was consenting to the opening of the drawer in the nightstand to allow for the retrieval of his wallet and identification. Any other conclusion would allow Winston the benefits of sandbagging the agents into committing a violation of his rights. Given the unquestioned facts, we see no reason why we should go along with such a deception.

In United States v. Cepulonis, agents bearing shotguns arrested and handcuffed Cepulonis outside his hotel room. 530 F.2d 238, 243 (1st Cir. 1976). Cepulonis requested to speak with his wife and child in the hotel room, and the agents allowed him to enter the hotel room in their company. Id. After conducting a protective sweep, the agents asked Cepulonis if there were any weapons in the room, to which he responded, "no, go ahead, search." Id. at 244. We upheld the district court's finding that the search was consensual. Id. Here, the inherent coerciveness of the situation is similar in that Winston was handcuffed, agents had drawn weapons, and family members were present. Favoring a finding of implied-in-fact consent in this case is the fact that a request for information about the location of Winston's identification is much more benign than a request for information about the location of weapons.

We do not find it of decisive significance that in response to the agent's question as to the location of the

nightstand, Winston motioned with his shoulder rather than speaking. In other situations, we have found implied-in-fact consent based entirely on silent actions. See Robbins v. MacKenzie, 364 F.2d 45, 48 (1st Cir. 1966). In Robbins, officers announced themselves at the door to a robbery suspect's apartment and asked to speak with him. Id. at 47. The suspect silently opened the door and walked back into the room. Id. We found that he "expresse[d] by his action as adequate a consent to entry as he would by a verbal invitation." Id. at 48.

We do not lightly reverse a district court's holding when reviewing for clear error. We note that the facts surrounding the search of the nightstand are undisputed, and thus we are not disturbing the district court's findings of historical facts or credibility. Given the record as determined by the district court, we find that the district court's holding that Winston's acts did not constitute an implied-in-fact consent to open the drawer of the nightstand is not fairly supported by the record.

The district court did not determine whether Winston's actions surrounding the search of the nightstand were voluntary. We have no trouble finding that Winston acted voluntarily.[1] As described above, an in-home arrest pursuant to a search warrant is

---

[1] Because we find no serious question as to whether Winston acted voluntarily, we see no need to remand to the district court to make this determination. See United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998).

-16-

an inherently coercive situation, but such a situation does not preclude a finding of voluntariness. <u>United States</u> v. <u>Watson</u>, 423 U.S. 411, 424 (1976). The subject matter of the request, Winston's identification, weighs heavily in favor of voluntariness. The agent testified that he routinely asks for identification when making arrests, and such a request is eminently reasonable. The mundaneness of identification makes it unlikely that agents would bother to use coercive methods to obtain it. Further, because Winston immediately responded to the agents' requests, the evidence shows that Winston merely answered their questions and was not coerced into doing so.

## IV.  Conclusion

The district court erred in suppressing the evidence obtained pursuant to the search warrant and Winston's statement claiming ownership of the safe. The motion to suppress is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

**<u>Reversed and Remanded</u>**.

**(Concurring and Dissenting opinion follows)**

**STAHL**, **Senior Circuit Judge**, **concurring in part and dissenting in part.** The majority's decision today misapplies precedent that dictates what is permissible under the modest "protective sweep" doctrine announced in Maryland v. Buie, 494 U.S. 325 (1990). The two officers who testified at the suppression hearing each stated that they had no reason to think that anyone dangerous (other than Charles Winston himself) was in the house where the safe was found. The government on appeal urges a number of factors it speculates might have given an officer grounds to fear an ambush here, including the fact that Winston was known to own and carry a firearm, but I do not believe that these factors add up to the degree of suspicion that Buie requires before a protective sweep may be conducted. The district court correctly concluded that the Fourth Amendment did not permit the agents who arrested Charles Winston to conduct a protective sweep of the basement of the apartment in which they found him, and that the evidence that resulted from that search had to be suppressed. While I join the majority in holding that the search of the nightstand was constitutional, I disagree with its conclusion that the search of the basement was likewise permissible. Respectfully, I dissent.

## I.

Before discussing my disagreement with the majority's position, I address the government's anterior argument that the

search was not a protective sweep at all, and that the agent who searched the basement was in fact simply searching for Charles Winston. The district court found that the search of the basement "cannot be justified by any attempt to locate the defendant" because "the agents had no need to search the basement for the defendant, having taken him into custody immediately upon entering the apartment." I would uphold the district court's factual conclusion.

At the hearing, the government relied on two witnesses, Special Agent Donald Wales, the arresting officer, and Special Agent Patrick Burns, another member of the arrest team. Notably, the state did not present the testimony of a Massachusetts State Trooper named Martin, the officer who performed the basement search and uncovered a concealed safe behind a furnace.

On the basis of the officers' testimony presented at the hearing, faithfully recounted by the district court and by the majority, it might be possible to take a number of views of what happened in the basement on the day Winston was arrested. One could surmise that Martin tore into the building and down the basement steps and quickly uncovered the safe, all before Agent Wales mounted the stairs and apprehended Winston on the second floor landing. Or one might conclude that Martin headed straight for the basement and was still there, searching for Winston and oblivious of the fact that the agents upstairs had already located

him, when he discovered the safe.  And it also might be possible to conclude that the apartment was so small that Martin, down in the basement, heard the ruckus upstairs, knew that Winston had been located, but continued searching nevertheless.

The district court rejected the first possibility out of hand, finding that Winston's arrest took place "within seconds" of the agents' entrance into the apartment.  That left two possibilities: either Martin never gleaned that Winston had been located upstairs, or he did but continued to search anyway.  On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search. See United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004) (citing Mincey v. Arizona, 437 U.S. 385, 390-91 (1978)).  The government made its case harder, if indeed it had a case, by failing to provide the testimony of Trooper Martin himself.  So long as Martin did not know that Winston had been found, he surely had a right to continue looking for him as long as his fellow officers made reasonably diligent efforts to communicate the fact of the arrest to him.  But only Martin himself could have testified as to whether he had reason to believe that Winston had been found.

The court had to determine, without the benefit of Martin's testimony, whether Martin knew or did not know that his license to continue searching for the defendant had come to an end.

-20-

Under the right circumstances, it would probably be reasonable to infer that an agent did not know -- but given the burden on the government, the uncertainty in this case had to be resolved in the defendant's favor. What is more, the district judge took a view of the house itself, and that fact is to be given much weight in our analysis. On the basis of the small size of the apartment as observed during the view, the district judge evidently concluded that anyone searching the basement would have been in a position to hear what was happening on the stairs to the second floor of the unit. Without Martin's testimony to the contrary, I defer to the district court in its finding that the officers "had no need to search the basement for the defendant, having taken him into custody immediately upon entering the apartment."

## II.

Once Martin's authority to search for Winston himself expired, the only remaining justification for continuing his search would have been that he was searching for potential assailants hiding in wait in the basement. In my opinion, such a protective sweep was not permissible here.

When law-enforcement agents legally enter a home and arrest a criminal suspect, the suspect nevertheless retains "an expectation of privacy in those remaining areas of his house" which the police have not yet searched. Buie, 494 U.S. at 333. The majority thinks that in this case, Winston's interest in that

-21-

privacy was outweighed by the searching officer's purported interest in the arrest team's safety. In so holding, it strikes a balance that is not in line with Buie or with the great mass of cases in any circuit in this area that have been decided in the years since Buie was handed down, and reaches a conclusion unsupported in the record.

Warrantless searches are "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). Buie established one such exception, which permits a protective sweep incident to an arrest if the searching officer has "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[s] the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others." Buie, 494 U.S. at 325 (internal quotations and citations omitted).[2] The constitutionality of a protective sweep under particular circumstances is a mixed question of fact and law: we review the court's factual findings for clear error "and then review de novo

---

[2] There are two Buie exceptions to the warrant requirement, of which the one claimed to apply in this case is the second, broader type discussed in the text. Under the first exception, officers are permitted to, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Buie, 494 U.S. at 334. The government is rightly not claiming that the basement search here was of a "space immediately adjoining the place of arrest."

its ultimate conclusion that the discerned facts constitute a sufficient legal basis to justify the conduct about which the defendant complains." United States v. Martins, 413 F.3d 139, 146 (1st Cir. 2005) (citing United States v. Schaefer, 87 F.3d 562, 565 (1st Cir. 1996); United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995)).

The Buie Court went to some effort to ensure that law-enforcement agents (as well as courts) would understand that the decision permits only limited searches and only under particular, narrow circumstances: a Buie sweep is "not a full search of the premises" and can involve only a "cursory" inspection of spaces in which a person could be found, 494 U.S. at 335; it is not a "top-to-bottom" search, id. at 336; and it is "decidedly not 'automati[c],'" id. (alteration in original) (quoting Chimel v. California, 395 U.S. 752, 766-67 (1969)). Respectful of these admonishments, we have strictly construed Buie's exceptions to the prohibition on warrantless searches.

Every one of our own cases addressing the propriety of a protective sweep has turned on the searching officer's suspicion vel non, based on some affirmative evidence, that a particular and identifiable individual, for example, the arrestee's missing accomplice or housemate, remained in the building that was searched. See Martins, 413 F.3d 139 (man whose voice answered door thought to be inside apartment); United States v. Lawlor, 406 F.3d

-23-

37 (1st Cir. 2005) (suspect's brother thought to be in house); Crooker v. Metallo, 5 F.3d 583 (1st Cir. 1993) (suspect's accomplice thought to be in house); United States v. Daoust, 916 F.2d 757 (1st Cir. 1990) (homeowner thought to be in house); see also United States v. Paradis, 351 F.3d 21, 29 n.7 (1st Cir. 2003) (protective sweep not permissible because police did not "believe that a specific individual other than the arrestee [was] present and dangerous").

Our sister circuits are widely in agreement. See, e.g., United States v. Gandia, 424 F.3d 255, 264 (2d Cir. 2005) ("Officers must point to facts that give rise to an individualized suspicion and cannot rely solely on generalizations that suspects are usually accompanied by dangerous third parties." (citing United States v. Moran Vargas, 376 F.3d 112, 116 (2d Cir. 2004))); see also United States v. Carter, 360 F.3d 1235, 1242-43 (10th Cir. 2004); United States v. Chaves, 169 F.3d 687, 692 (11th Cir. 1999); Sharrar v. Felsing, 128 F.3d 810, 825 (3d Cir. 1997); United States v. Colbert, 76 F.3d 773, 777-78 (6th Cir. 1996); United States v. Ford, 56 F.3d 265, 269 & n.6 (D.C. Cir. 1995); United States v. Delgadillo-Velásquez, 856 F.2d 1292, 1298-99 (9th Cir. 1988) (anticipating Buie).[3]

---

[3] The Fourth Circuit has produced no cases in point. The Fifth Circuit has few, but they are consistent with the general principle I have described. See United States v. Waldrop, 404 F.3d 365, 369 (5th Cir. 2005); United States v. Muñoz, 150 F.3d 401, 411-12 (5th Cir. 1998). The Seventh Circuit is similarly consistent. See,

By their own admission at the suppression hearing, the agents in this case had no information indicating affirmatively that anyone other than Winston was in the house. There was, as far as the government showed, only the defendant's car in front of the building, and no one had entered the apartment for the hour and a half that the officers spent watching the house prior to their entry. The government's only two witnesses were Wales and Burns. On cross-examination by the defense, Wales was asked: "You didn't have any reason on that morning to believe that there was any other specific person that you knew of in that apartment, is that correct?" Wales testified in reply: "I didn't have any reason to believe there was anybody in either one."[4] Similarly, Agent Burns was asked, "You had no information whatsoever that Mr. Winston had anybody there who would attempt to aid him or anything like that in the event of an arrest, is that correct?" Burns replied simply, "Yes."

---

e.g., Leaf v. Shelnutt, 400 F.3d 1070, 1088 (7th Cir. 2005); United States v. Burrows, 48 F.3d 1011, 1017 (7th Cir. 1995); United States v. Barker, 27 F.3d 1287, 1291 (7th Cir. 1994). A more permissive view is taken in the Eighth Circuit. See United States v. Cash, 378 F.3d 745, 749 (8th Cir. 2004); United States v. Horne, 4 F.3d 579, 586 (8th Cir. 1993).

[4] Wales had earlier testified that the agents had set out to look for Winston at 110-A Carr Street, but on arriving at the location had discovered that the building at 110 Carr Street had two unmarked doors. Wales' reference to "either one" was a reference to the confusion: Wales evidently did not have information about whether anyone was in either of the two apartments that might have been 110-A.

As far as the government showed at the hearing, therefore, the officers at the arrest site that day had no information that would indicate that anyone other than Winston was in the house in which they hoped to arrest him.[5] And if Buie's admonition that its exception is not to be seen as automatic is to mean anything at all, "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." Colbert, 76 F.3d at 778. Cf. id. (protective sweep unjustified in part because the arresting officer "testified that he 'didn't have any information at all' when asked whether he had information that anyone was inside the . . . apartment prior to his decision to conduct the protective sweep"). See also Carter, 360 F.3d at 1242-43 ("Of course, there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in Buie."); Delgadillo-Velásquez, 856 F.2d at 1298 (protective sweep was unconstitutional where officers had "no information that any other persons were in the apartment").

The majority's approval of the search here rests in large part on the arresting officers' belief that Winston had, at some point, bought two guns and a bullet-proof vest from a co-

---

[5] Once Winston's girlfriend Ortiz opened the door, the agents of course knew that she was there, but Ortiz's presence did not make the presence of dangerous third parties more likely.

conspirator, and the report of a police officer who had detained Winston for a traffic violation and found he was carrying a handgun. These facts should have given the arrest team cause to worry that Winston himself posed a threat to them, but they did nothing to justify a belief that there was anyone else in the house with Winston on the day of his arrest. "The facts upon which officers may justify a <u>Buie</u> protective sweep are those facts giving rise to a suspicion of danger from attack by a <u>third</u> <u>party</u> during the arrest, not the dangerousness of the arrested individual." <u>Colbert</u>, 76 F.3d at 777 (emphasis added).

The majority also relies on Winston's yell (suspiciously quick) from the top of the stairs, indicating to the agents that he was on the second floor, along with Winston's girlfriend's attempt (suspiciously dilatory) to mislead the agents by denying knowledge of the car parked out front. The latter, the majority thinks, might have been an effort to delay the police while an ambush was set up, while the former could have been an effort to distract them while it was being sprung. Though not an argument offered by either of the officers in their testimony, this seems a plausible theory. In order to justify a <u>Buie</u> sweep, however, law-enforcement agents need more than a plausible theory that hypothesizes a third person on the premises. Nearly any indication that some third person is present might be enough -- an unaccounted-for voice behind a door, <u>Martins</u>, 413 F.3d at 151; movement in an upstairs

window, Burrows, 48 F.3d at 1017; an extra car in a driveway, United States v. Hauk, 412 F.3d 1179, 1192 (10th Cir. 2005) -- but without any affirmative indication of this sort that a third person may be lying in wait, the police have nothing more than the "mere 'inchoate and unparticularized suspicion or "hunch"'" that the Court indicated in both Terry and Buie was insufficient to justify a warrantless search. Buie, 494 U.S. at 332 (quoting Terry v. Ohio, 392 U.S. 1, 27 (1968)).[6]

## III.

For the foregoing reasons, I would affirm the decision of the district court to suppress the material seized from the safe in

---

[6] The government makes a pair of additional arguments in favor of admission of the evidence at issue, but both are unavailing. The first is easily disposed of: the government argues on appeal that the safe in the basement would inevitably have been found and thus should be admissible under the inevitable discovery rule of Nix v. Williams, 467 U.S. 431 (1984), but it did not make that argument to the district court and it offers no reason why we should take it up for the first time on appeal. See United States v. Dimeo, 28 F.3d 240, 241 n.3 (1st Cir. 1994); United States v. Elwell, 984 F.2d 1289, 1298 (1st Cir. 1993). For the second, the government raises the question of the applicability of the good-faith exception to the warrant requirement, announced in United States v. Leon, 468 U.S. 897, 924 (1984), which permits an officer to rely on a defective warrant if he does so in good faith. The good faith exception is inapposite here, however. The doctrine forgives an officer for the error of a magistrate or other official who issues a warrant, but is not available to an officer who objectively should have known that the information supporting the application was unconstitutionally obtained. "Leon requires not merely good faith, but objective good faith." United States v. Curzi, 867 F.2d 36, 44 (1st Cir. 1989) (citing Leon, 468 U.S. at 924). I need not question the subjective good faith of the agents who searched Winston's house in order to conclude, as I do, that it would not have been reasonable for them to believe that their searches were constitutionally permissible.

Winston's basement and Winston's statement made in response to the discovery of that safe.  I respectfully dissent.