STUART, Justice.
 

 This Court granted certiorari i'eview to determine whether the decision of the Court of Criminal Appeals in this case conflicts with
 
 Wong Sun v. United States,
 
 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and
 
 Harris v. State,
 
 568 So.2d 421 (Ala.Crim.App.1990). The Court of Criminal Appeals affirmed the trial court’s denial of Jarvis Lamar Bridgett’s motion to suppress evidence in the form of marijuana seized from a lockbox found in a bedroom Bridgett was sharing with his girlfriend. We affirm.
 

 Facts
 

 Investigator Shane Killingsworth of the Huntsville Police Department testified during the hearing on Bridgett’s motion to suppress that he and other officers responded to a domestic-violence call at the house of the Bridgett’s girlfriend, Gloria Curian. When the officers arrived, Bridgett told them he wanted to pack a bag and leave the house. The officers allowed Bridgett to go upstairs and retrieve his belongings from the bedroom. While Bridgett was packing, Curian told the officers that there were guns in the bedroom. Killingsworth testified that he immediately went upstairs. He stated: “I removed [Bridgett] from the bedroom, patted him down. He didn’t have any weapons on him. I believe the only property that we recovered from him was a key ring in his jacket pocket.” Bridgett was removed from the house and placed in a police car. A subsequent search of the bedroom yielded a .25 caliber automatic handgun, a .22 caliber rifle, and a lockbox. Each gun had a lock on it. Killingsworth testified that both Bridgett and Curian told him that the lockbox belonged to Bridgett. Killings-worth stated that Bridgett informed him that he did not have the keys to the lock-box. Killingsworth further testified that he asked Bridgett if he could use the keys on the key ring to open the lockbox to see if there were any firearms in it. Bridgett responded that “he didn’t have a problem with it. That none of the keys would work on the [lockbox] anyway.” Contrary to Bridgett’s statement to Killingsworth, keys on the key ring unlocked the gun locks and the lockbox. The lockbox contained a small amount of marijuana and a magazine of ammunition for a handgun.
 

 Marvolene McBride, Bridgett’s aunt, testified for the defense. She stated that Bridgett was placing items in her vehicle when an officer approached him and escorted him to a police car. She stated that while the officer and Bridgett were talking another officer carried the lockbox out of the house and placed it on the hood of the police car. According to McBride, she never heard the officer ask Bridgett for
 
 *1059
 
 permission to try the keys on the key ring to open the lockbox.
 

 Bridgett testified at the suppression hearing. According to Bridgett’s testimony, Bridgett was preparing to leave the house and had just retrieved his shoes when an officer approached him, conducted a second patdown search
 
 [1]
 
 of his person, and informed him that he was being detained. The officer then handcuffed him and placed him in a police car. Bridgett testified that he was in the back of the police car for an hour and a half to two hours. Bridgett explained that he was not wearing a jacket at the time and that he did not know when or where the officers found the keys the officers used to open the lockbox and the gun locks. He denied giving the officers permission to use the keys to try to unlock the lockbox, but he stated that he told the officer that the key to the lockbox could be on the key ring. The trial court denied Bridgett’s motion to suppress, and he appealed to the Court of Criminal Appeals. That court affirmed the trial court’s order.
 
 Bridgett v. State,
 
 1 So.3d 1054 (Ala.Crim.App.2007). Bridgett then filed a petition for the writ of certio-rari with this Court.
 

 Discussion
 

 Bridgett argues that the Court of Criminal Appeals erred in affirming the trial court’s order refusing to suppress the marijuana found in the lockbox because, he says, the court erred in concluding that the issue in this case was whether Bridgett had voluntarily consented to the officers’ use of the key that opened the lockbox. According to Bridgett, the key to the lock-box was illegally seized; therefore, he argues, it is irrelevant whether he voluntarily consented to the use of the keys to open the lockbox because, he argues, the marijuana that was found as a result of the use of the illegally seized keys is the fruit of the poisonous tree. Thus, Bridgett argues, the Court of Criminal Appeals’ decision affirming the trial court’s order denying his motion to suppress the marijuana conflicts with
 
 Wong Sun v. United States,
 
 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and
 
 Harris v. State,
 
 568 So.2d 421 (Ala.Crim.App.1990).
 

 In
 
 Wong Sun,
 
 the United States Supreme Court held that a court, when considering the admissibility of evidence obtained as a result of illegal government action, must determine ‘“whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.’ ” 371 U.S. at 488 (quoting Maguire,
 
 Evidence of Guilt
 
 221 (1959)). If the evidence is determined to be the “fruit of the poisonous tree,” then the evidence must be suppressed.
 
 Id.
 
 The Court of Criminal Appeals applied the
 
 Wong Sun
 
 holding in
 
 Harris,
 
 stating:
 

 “[Although the appellant consented to the police officer’s search of his trunk, this consent was tainted by the prior illegal police action.
 
 Wong Sun v. United States,
 
 371 U.S. 471 (1963). ...
 

 “ ‘... [Wjhile it is thus true that a consent to search which fails the vol-untariness test because of prior illegality may just as convincingly be said to be a fruit of the prior illegality, the fruit of the poisonous tree doctrine also extends to invalidate consents which
 
 are
 
 voluntary.’ ”
 

 568 So.2d at 424.
 

 The facts in the record are conflicting as to whether the key ring holding the key to
 
 *1060
 
 the lockbox was obtained during a
 
 Terry v. Ohio,
 
 892 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), patdown search of Bridgett or during the search of the bedroom for weapons. We need not determine whether the key was illegally seized, however, because, even it if was, we conclude that Bridgett’s consent to the use of the key was voluntary and that the search of the lockbox was sufficiently purged from the original taint.
 
 Wong Sun,
 
 supra.
 

 The United States Court of Appeals for the Eleventh Circuit in
 
 United States v. Delancy,
 
 502 F.3d 1297 (11th Cir.2007), has provided a two-part test to assist in the analysis when a consent to search follows illegal police action, stating:
 

 “Under controlling case law, we are required to conduct two separate inquiries where a consent to search follows prior illegal activity by the police. First, a court must determine whether the consent was voluntary. Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the ‘fruit of the poisonous tree’ — the product of an illegal entry. See
 
 United States v. Santa,
 
 236 F.3d 662, 676-77 (11th Cir.2000):
 

 “ ‘For consent given after an illegal seizure to be valid, the Government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure. Thus, the voluntariness of consent is only a threshold requirement; a voluntary consent to search does not remove the taint of an illegal seizure. Rather, the second requirement focuses on causation: “whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” ’
 

 “(quoting
 
 Wong Sun v. United States,
 
 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)) (citations omitted); see
 
 also United States v. Ramirez-Chilel,
 
 289 F.3d 744, 752 n. 9 (11th Cir.2002) (‘Typically, if the ensuing search occurs after an initial illegality, such as an illegal entry or an illegal arrest, we must first determine whether the consent to search was voluntary and then, whether the consent was tainted by the initial illegality.’).
 

 “This two step approach is mandatory, and the government bears the burden on both issues. See
 
 United States v. Robinson,
 
 625 F.2d 1211, 1219 (5th Cir. 1980)....
 

 “As the Supreme Court observed long ago, ‘[w]e need not hold that all evidence is “fruit of the poisonous tree” simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.’
 
 Wong Sun v. United States,
 
 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (quotation marks omitted). We are obliged to determine whether the consent was ‘sufficiently an act of free will to purge the primary taint of the unlawful invasion,’ or, alternatively, whether the causal connection had ‘become so attenuated as to dissipate the taint.’
 
 Id.
 
 at 486-87, 83 S.Ct. 407 (quotation marks omitted).
 

 “This is a fact-specific question, and no single fact is dispositive. See
 
 Brown v. Illinois,
 
 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)....
 

 
 *1061
 
 “In
 
 Santa,
 
 we considered three factors in determining whether a defendant’s consent was tainted by his illegal arrest: ‘[1] the temporal proximity of the seizure and the consent, [2] the presence of intervening circumstances, and, particularly, [3] the purpose and flagrancy of the official misconduct.’ 236 F.3d at 677.
 

 “The three factors are not meant to be exhaustive, and commentators have suggested others. See Wayne R. La-Fave,
 
 Search and Seizure
 
 § 8.2(d) (4th ed.2004) (discussing additional factors such as “whether the seizure brought about police observation of the particular object which they sought consent to search, ... whether the consent was volunteered rather than requested by the detaining officers, whether the ar-restee was made fully aware of the fact that he could decline to consent and thus prevent an immediate search of the car or residence, whether there has been a significant intervening event such as presentation of the arrestee to a judicial officer, and whether the police purpose underlying the illegality was to obtain the consent’ (footnotes omitted)). Moreover, we will not allow a factor-based analysis to obscure the underlying question, which ‘generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant’s response.’
 
 United States v. Bailey,
 
 691 F.2d 1009, 1013 (11th Cir. 1982). Nevertheless, the factors do provide a useful structure....
 

 “1. Temporal Proximity
 

 “The time elapsed between the illegal act and a subject’s consent to search is obviously relevant. If only a short period of time has passed, a court is more likely to consider the consent as a ‘poisonous fruit’ of the illegal act — that is, that the consent is tainted.
 
 Wong Sun
 
 provides an illustration of this principle. There, the Court suppressed statements from one defendant when they were given almost immediately after the police broke the door of his apartment, rushed in, and handcuffed him. See
 
 Wong Sun,
 
 371 U.S. at 486, 83 S.Ct. 407 (‘Six or seven officers had broken the door ... into the bedroom where his wife and child were sleeping. He had been almost immediately handcuffed and arrested. Under such circumstances it is unreasonable to infer that [his] response was sufficiently an act of free will to purge the primary taint of the unlawful invasion.’). By contrast, when another defendant in the same case ‘had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, [the Court] h[e]ld that the connection between the arrest and the statement had become so attenuated as to dissipate the taint.’
 
 Id.
 
 at 491, 83 S.Ct. 407 (quotation marks omitted).
 

 “There is no bright-line rule defining the temporal factor. But, if the period of time is extremely short, this factor weighs in favor of exclusion.
 
 See, e.g., Santa,
 
 236 F.3d at 666-67, 678 (observing that there had been no ‘significant lapse of time’ in a case where the defendant, handcuffed and lying on the floor, consented to a search just two to three minutes after the police made an illegal forced entry into his home); see also
 
 United States v. Chanthasouxat,
 
 342 F.3d 1271, 1280 (11th Cir.2003) (‘In the present case, there was an extremely close temporal proximity between the illegal stop and Chanthasouxat’s consent to the search because the video tape revealed that only three minutes elapsed between the time Officer Carter stopped the van and Chanthasouxat consented to a search.’). By contrast, a longer interval obviously weighs in favor of admissi
 
 *1062
 
 bility.
 
 See, e.g., Devier v. Zant,
 
 3 F.3d 1445, 1459 (11th Cir.1993) (per curiam) (‘Under these circumstances, we must conclude that any taint from his detention on December 2 had been completely attenuated by the time of his eventual confession four days later.’).
 

 [[Image here]]
 

 “2. Intervening Circumstances
 

 “The second factor is the presence of intervening circumstances, or events that interrupt the causal connection between the illegal act and the possibly tainted consent or confession.
 
 See Brown,
 
 422 U.S. at 611, 95 S.Ct. 2254 (Powell, J., concurring in part) (characterizing the inquiry as whether ‘some demonstrably effective break’ has occurred); see also
 
 Taylor v. Alabama,
 
 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) (discussing a defendant who was arrested without probable cause ‘in the hope that something would turn up,’ and confessed shortly thereafter without any meaningful intervening event);
 
 United States v. Edmondson,
 
 791 F.2d 1512, 1516 (11th Cir.1986) (mentioning the defendant’s removal from the scene of the arrest as an intervening circumstance).
 

 [[Image here]]
 

 “3. Purpose and Flagrancy of Government Conduct
 

 “The final factor is the purpose and flagrancy of the official conduct. This factor is also the most straightforward, and ... the most important one. If the police entry had been made for the purpose of gaining consent to conduct a full-scale search, we would be bound to find the consent tainted. Indeed, when the police act with the express purpose of exploiting an illegal action, the causation is so obvious that no real attenuation analysis is even necessary. See
 
 Florida v. Royer,
 
 460 U.S. 491, 505, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (opinion of White, J.) (finding evidence seized after an illegal arrest tainted and omitting the attenuation analysis entirely when the seizure was part of ‘the officers’ attempt to gain [the defendant’s] consent to a search of his luggage’).”
 

 502 F.3d at 1308-12 (footnotes omitted).
 

 This two-step test in
 
 Delaney
 
 provides a workable means for determining whether evidence seized from a search to which consent is given following prior illegal activity by the police must be excluded as the fruit of a poisonous tree; this Court adopts that test and will now apply it to the facts of this case.
 

 1. Was the consent voluntary?
 

 We consider the trial court’s conclusion that Bridgett voluntarily consented to the use by the officers of the keys on the key ring to unlock the lockbox in light of the principles set forth in
 
 Kennedy v. State,
 
 640 So.2d 22 (Ala.Crim.App.1993). In
 
 Kennedy, the
 
 Court of Criminal Appeals provided a thorough discussion on the standard for determining whether a defendant’s consent to a search was voluntary, stating:
 

 “ ‘A person may consent to a search without a warrant and thereby waive any protection afforded by the Fourth Amendment to his right of privacy.
 
 Duncan v. State,
 
 278 Ala. 145, 176 So.2d 840 (1965). Consent to a search must be knowingly, intelligently, and freely given.’
 
 Ex parte Wilson,
 
 571 So.2d 1251, 1255 (Ala.1990). ‘[T]he question whether a consent to a search was in fact “voluntary” or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.’
 
 Schneckloth v. Bustamonte,
 
 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854 (1973). ‘The standard for
 
 *1063
 
 measuring the scope of a suspect’s consent under the Fourth Amendment is that of “objective” reasonableness— what would the typical reasonable person have understood by the exchange between the officer and the suspect?’
 
 Florida v. Jimeno,
 
 500 U.S. 248, 249-51, 111 S.Ct. 1801, 1803-04, 114 L.Ed.2d 297 (1991).
 

 “This Court has recently held:
 

 “ ‘A search pursuant to a valid consent is constitutionally permissible. See
 
 Ex parte Wilson,
 
 571 So.2d 1251, 1255 (Ala.1990);
 
 Hubbard v. State,
 
 500 So.2d 1204, 1221-22 (Ala.Cr.App.), affirmed, 500 So.2d 1231 (Ala.1986). “When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.”
 
 Bumper v. North Carolina,
 
 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). See
 
 State v. Kyles,
 
 571 So.2d 1283 (Ala.Cr.App.), on return to remand, 574 So.2d 1057 (Ala.Cr.App. 1990).
 

 “ ‘ “[T]he question whether a consent to a search was in fact ‘voluntary’ or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.”
 

 “
 
 ‘Schneckloth v. Bustamonte,
 
 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48, 36 L.Ed.2d 854 (1973).
 

 “ ‘Mere submission to police authority will not suffice for consent.
 
 Schneckloth,
 
 412 U.S. at 233, 93 S.Ct. at 2051;
 
 Bumper v. North Carolina,
 
 391 U.S. at 548-49, 88 S.Ct. at 1792;
 
 Amos v. United States,
 
 255 U.S. 313, 317, 41 S.Ct. 266, 268, 65 L.Ed. 654 (1921);
 
 Herriott v. State,
 
 337 So.2d 165, 169 (Ala.Cr.App.), cert. denied, 337 So.2d 171 (Ala.1976). While a “ ‘display of weapons is a coercive factor that sharply reduces the likelihood of freely given consent,’ ” 3 W. La-Fave,
 
 Search and Seizure,
 
 § 8.2(b) at 181 (2d ed.1987), the determination of voluntariness requires “careful sifting of the unique facts and circumstances of each case.”
 
 Schneckloth,
 
 412 U.S. at 233, 93 S.Ct. at 2050.
 

 “ ‘A show of force is a significant factor in the voluntariness equation, but it does not always vitiate consent to search. See
 
 United States v. Kelley,
 
 953 F.2d 562, 566 (9th Cir.1992);
 
 United States v. Phillips,
 
 664 F.2d [971] at 1024 [ (5th Cir.1981) ];
 
 United States v. Cepulonis,
 
 530 F.2d 238, 243-44 (1st Cir.), cert. denied, 426 U.S. 908[, 96 S.Ct. 2231, 48 L.Ed.2d 834] (1976);
 
 United States v. Evans,
 
 519 F.2d 1083 (9th Cir.), cert. denied, 423 U.S. 916 [96 S.Ct. 224, 46 L.Ed.2d 145] (1975).
 

 [[Image here]]
 

 “ ‘If the evidence relating to a consent search is in conflict, “it is the duty of the trial court to resolve any conflict in the testimony and not within the province of this Court. The trial court [is] in a better position to judge the demeanor of the witnesses.”
 
 Hollenquest v. State,
 
 394 So.2d 385, 389 (Ala.Cr.App.1980) (citations omitted), cert. denied, 394 So.2d 389 (Ala. 1981). When an accused contests the police version of the facts relating to an alleged consent search, this “presents an issue of fact to be resolved by the trial judge based on his assessment of the relative credibility of the parties; the issue will generally not be rev[ers]ed on appeal unless the judge’s finding was clearly erroneous.” 1 W. Ringel,
 
 Searches and Sei-ztires, Arrests and Confessions
 
 
 *1064
 
 § 9.3(a) at 9-6 (2d ed.1992). See
 
 United States v. Cepulonis,
 
 530 F.2d at 243;
 
 Jordan v. State,
 
 384 So.2d 277 (Fla.App.1980)(trial court’s decision as to whether accused was consenting or was submitting to authority would not be disturbed unless clearly erroneous), abrogated on other grounds,
 
 Elsleger v. State,
 
 503 So.2d 1367 (Fla.App.1987).
 

 [[Image here]]
 

 “ ‘We have considered the fact that the appellant was not told he had the right to refuse to consent to the search, and we do not find it to be determinative here. In
 
 Schneckloth v. Bustamonte,
 
 the Supreme Court observed that ‘[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the
 
 sine gua non
 
 of an effective consent.’ 412 U.S. at 227, 93 S.Ct. at 2048. See generally 1 Ringel § 9.2 at 9-3. The facts of this case provide a reason to believe that, notwithstanding the failure to inform the appellant that he had the right to refuse to allow the search, his consent was nevertheless voluntary.
 

 “ ‘The appellant twice denied that there were any “weapons or drugs or anything” in the vehicle. R. 27, 28, 50. “[A] belief that nothing personally incriminating is to be found in the place the police want to search [is a] factor[ ] tending to show that a consent is voluntary.” 3 LaFave at § 8.2(h) at 206....
 

 “ ‘The argument that “no sane man who denies his guilt would actually be willing that policemen search ... for contraband which is certain to be discovered,”
 
 Higgins v. United States,
 
 209 F.2d 819, 820 (D.C.Cir.1954), has generally been rejected, see 3 LaFave § 8.2(h) at 208, and has specifically been rejected by this Court,
 
 Quinn v. State,
 
 611 So.2d 483, 487 (Ala.Cr.App. 1992). A defendant who believes that there is no contraband in the place to be searched or that it is hidden too well to be found might well give his voluntary consent to a search, 3 La-Fave § 8.2(h) at 208 & n. 178. On the other hand, the defendant may simply be “giving up.”
 

 “ ‘ “ ‘[T]he pressure exerted on a criminal by the realization that the jig is up is far different from the deliberate or ignorant violation of personal right that renders apparent consent ineffective.’
 
 [Gorman v. United States,
 
 380 F.2d 158, 165 (1st Cir.1967) ]. The soundness of that principle is dramatically revealed in
 
 North Carolina v. Alford,
 
 [400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) ], where the Court held that a defendant might voluntarily plead guilty even though he claimed to believe he was innocent. If at the time that a particular question is asked there is no agreeable answer, the fact that the answer chosen is not a pleasant one does not mean necessarily that it was not voluntarily selected. The alternative might have seemed worse.
 

 “ ‘ “The application of that principle to consent to search is particularly apt. A defendant may believe that search is ultimately inevitable whether he consents or not. In such circumstances a suspect might well feel he is better off to consent than to oppose.”
 

 “
 
 ‘Leavitt v. Howard,
 
 462 F.2d 992, 997 (1st Cir.) (footnotes omitted), cert. denied, 409 U.S. 884 (1972), quoted in
 
 United States v. Cepulonis,
 
 530 F.2d
 
 *1065
 
 at 244; B LaFave at § 8.2(h) at 208-09. “Bowing to events, even if one is not happy with them, is not the same thing as being coerced.”
 
 State v. Lyons,
 
 458 P.2d 30, 32 (Wash.1969).’
 

 “Martinez v. State,
 
 624 So.2d 711 (Ala.Cr.App.1993).
 

 “ ‘When the evidence pertaining to the voluntariness of a consent is conflicting, the trial court is in the best position to determine consent or lack thereof.... On appeal, this court will not disturb the trial court’s finding unless we are convinced that the conclusion is palpably contrary to the weight of the evidence.’
 
 Daniels v. State,
 
 534 So.2d 628, 654 (Ala.Cr.App.1985), affirmed, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987). ‘[C]onflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court.’
 
 Atwell v. State,
 
 594 So.2d 202, 212 (Ala.Cr.App. 1991), cert. denied, 594 So.2d 214 (Ala. 1992).
 

 “ ‘[W]hen conflicting evidence is presented on the issue of the voluntariness of a consent to search and the trial judge finds that the consent was voluntarily given, great weight must be given his judgment. This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the weight of the evidence. Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and volun-tariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty.’
 

 “Weatherford v. State,
 
 369 So.2d 863, 871 (Ala.Cr.App.), cert. denied, 369 So.2d 873 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979).
 

 “ ‘Although this finding was made on conflicting evidence, the trial court’s “credibility choices at suppression hearings are binding on this court.”
 
 United States v. Aldridge,
 
 719 F.2d 368, 373 (11th Cir.1983). “The trial court’s finding [of the voluntariness of the consent to search] will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the weight of the evidence.”
 
 Coots v. State,
 
 434 So.2d 864, 867 (Ala.Cr.App.1983). We indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence. The trial judge was in a better position to judge thereof than this Court[,] having seen the witnesses, observed their demeanor, and heard them testify.
 
 Sullivan v. State,
 
 23 Ala.App. 464, 465, 127 So. 256, 257 (1930). In reviewing the correctness of the trial court’s ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court. Additionally, if the trial court’s ruling is correct for any reason, it will not be reversed because the trial court assigned the wrong reason.
 
 Harnage v. State,
 
 290 Ala. 142, 144, 274 So.2d 352, 354 (1972).’
 

 “Bradley v. State,
 
 494 So.2d 750, 760-61 (Ala.Cr.App.1985), affirmed, 494 So.2d 772 (Ala.1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987).”
 

 640 So.2d at 24-26.
 

 Here, Killingsworth testified that Bridgett gave him permission to use the keys on the key ring to try to unlock the lock-box. According to Killingsworth, when he asked Bridgett, who was handcuffed and
 
 *1066
 
 seated in a police car, for permission to use the keys to try to open the lockbox, Bridgett consented. Bridgett, on the other hand, testified that he did not give the officers permission to search anything. The following exchange occurred during the State’s cross-examination of Bridgett:
 

 “[Prosecutor]: You heard Investigator Killingsworth say you were asked, ‘Look, can we use the keys on the gun locks and the [lockbox].’ Were you asked that?
 

 “[Bridgett]: I was asked that, but I never seen the keys.
 

 “[Prosecutor]: You were asked that. Okay. We’re making some progress. What did you say in response to that?
 

 “[Bridgett]: I said, ‘Well I don’t own keys to the locks.’ I was like but — T mean, the gun locks, I don’t own any keys to any gun lock because I don’t own any guns.’ I told them at that time the keys to the lockbox could be on there because me and her both use those keys.
 

 “[Prosecutor]: But they asked can we use the keys. And what did you say?
 

 “[Bridgett]: I said the keys that are to the locks, they’re not going to be on that ring. I told them no.
 

 “[Prosecutor]: You told them no they can’t search or no, the keys aren’t going to be there?
 

 “[Bridgett]: No, they can’t search because the keys, I don’t own any gun locks.
 

 [[Image here]]
 

 “[Bridgett]: I told them at that time I didn’t own any guns or any gun locks. The [lockbox] was never brought up at that time.
 

 “[Prosecutor]: You’re saying — when was the [lockbox] brought up?
 

 “[Bridgett]: I didn’t know about the [lockbox] until probably an hour later. I seen them sit the [lockbox] on top of a hood of a police cruiser, and at this point they went through with flashlights and just took everything out basically and scattered it all over the car. I don’t know what was in the box or what had been placed in it or what had been taken out of the box.”
 

 As defense counsel admitted during his final argument at the suppression hearing, conflicting evidence was presented as to whether Bridgett consented to the use of the keys on the key ring to unlock the lockbox. This Court accords deference to the trial court’s credibility choices. Substantial evidence was presented from which the trial court could conclude that Bridgett voluntarily consented to the use of the keys to search the lockbox.
 

 2. Was the consent tainted by illegal police conduct?
 

 Now, we must determine whether Bridgett’s consent was tainted by the alleged illegal seizure of the keys, i.e., whether Bridgett’s consent to the use of the keys was a product of the alleged illegal seizure of the keys. Applying the three factors set forth by the Eleventh Circuit Court of Appeals in
 
 Delaney,
 
 we first consider “the temporal proximity of the seizure and the consent.” The record is unclear whether the keys were seized when the officers first entered the house and patted Bridgett down for weapons, when they searched Bridgett after they learned that guns were in the upstairs bedroom where Bridgett was packing his belongings, or at some other time. Indeed, Bridgett testified that he did not know when the keys were seized. However, our reading of the testimony indicates that the keys were seized before the officers located the lockbox and that at least one hour had passed from the time Bridgett was placed in the police car and the
 
 *1067
 
 time Killingsworth approached him about using the keys to open the lockbox. Because it appears that the request for Bridgett’s consent to use the keys did not immediately follow the alleged illegal seizure of the keys, the factor of timing weighs in favor of admitting into evidence the marijuana found in the lockbox. See
 
 Delaney.
 

 Next, we consider “intervening circumstances.” Nothing in the testimony indicates that when the officers seized the keys the keys had some overt importance. Circumstances that appear important are: Bridgett, instead of leaving the residence immediately after the police arrived, asked to retrieve his belongings from an upstairs bedroom; while Bridgett was packing, the officers learned that there were guns in the bedroom; the officers then immediately removed Bridgett from the bedroom, and the search of the bedroom yielded an automatic handgun, a rifle, and a lockbox. These circumstances indicate that the keys obtained no significance until after the gun locks and lockbox were discovered. Thus, the intervening circumstance of the officers learning about and then locating the guns and the lockbox in the bedroom where the officers had permitted Bridgett to go to pack his belongings made the earlier seizure of the keys, which at that time appeared innocuous, important. Nothing indicates that the seizure of the keys prompted the search of the bedroom for weapons or that the seizure of the keys was a consequence of finding the lockbox and the gun locks. Therefore, these circumstances attenuate any taint from the seizure of the keys. Consequently, this factor does not weigh toward suppressing the marijuana.
 

 Last and most important, we consider “the purpose and flagrancy of the official misconduct.” Nothing in the record indicates that the police purpose underlying the seizure of the keys was to obtain Bridgett’s consent to use the keys to open the lockbox. The record indicates that the officers’ only purpose in seizing the keys was to ensure that the keys were not a weapon that could be used to harm the officers or the other individuals in the house. Bridgett did not argue at the hearing or on appeal that the stated purpose for seizing the keys was a subterfuge or that the officers’ conduct was flagrant. Therefore, this factor does not weigh in favor of suppressing the marijuana.
 

 Taking all three factors in consideration, we conclude that the alleged illegal seizure of the keys did not taint Bridgett’s consent and that the denial of Bridgett’s motion to suppress was proper. As the United States Supreme Court stated in
 
 Hudson v. Michigan,
 
 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006):
 

 “Suppression of evidence, however, has always been our last resort, not our first impulse. The exclusionary rule generates ‘substantial social costs,’
 
 United States v. Leon,
 
 468 U.S. 897, 907, 104 S.Ct. 3405 (1984), which sometimes include setting the guilty free and the dangerous at large. We have therefore been ‘cautio[us] against expanding’ it,
 
 Colorado v. Connelly,
 
 479 U.S. 157, 166, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and ‘have repeatedly emphasized that the rule’s “costly toll” upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application,’
 
 Pennsylvania Bd. of Probation and Parole v. Scott,
 
 524 U.S. 357, 364-365, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (citation omitted). We have rejected ‘[¡Indiscriminate application’ of the rule,
 
 Leon,
 
 supra, at 908, 104 S.Ct. 3405, and have held it to be applicable only ‘where its remedial objectives are thought most efficaciously served,’
 
 United States v. Calandra,
 
 414
 
 *1068
 
 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) — that is, “where its deterrence benefits outweigh its “substantial social costs,” ’
 
 Scott,
 
 supra, at 363, 118 S.Ct. 2014 (quoting
 
 Leon,
 
 supra, at 907, 104 S.Ct. 3405).”
 

 547 U.S. at 591.
 

 Conclusion
 

 The trial court properly denied Bridgett’s motion to suppress the marijuana seized from the lockbox, and the decision of the Court of Criminal Appeals affirming the trial court’s order does not conflict with
 
 Wong Sun
 
 and
 
 Hams.
 
 The judgment of the Court of Criminal Appeals is affirmed.
 

 AFFIRMED.
 

 COBB, C.J., and SEE, LYONS, WOODALL, SMITH, BOLIN, PARKER, and MURDOCK, JJ., concur.
 

 [1]
 

 . The first patdown search of Bridgett’s person was conducted when the officers arrived at the house.