16 So.3d 121 (2008)
W.D.H.
v.
STATE of Alabama.
CR-07-0566.
Court of Criminal Appeals of Alabama.
October 31, 2008.
Rehearing Denied February 20, 2009.
*122 Shanon D. Haack, Montgomery, for appellant.
Troy King, atty. gen., and Nancy M. Kirby, deputy atty. gen., for appellee.
WELCH, Judge.
W.D.H. was granted youthful-offender status in this case. After the trial court denied his motion to suppress evidence seized during a pat-down search, W.D.H. entered a plea of guilty to possession of marijuana in the first-degree, a violation of § 13A-12-213, Ala.Code 1975. The trial court sentenced him to serve three years in prison, but the sentence was suspended, and W.D.H. was placed on probation.
W.D.H. appeals from the conviction entered upon his plea of guilty on the ground that the trial court improperly denied his motion to suppress. In its brief on appeal, the State contends that the issue was not properly reserved for appellate review.
The record shows that at the plea hearing, W.D.H. reserved the right to appeal from the trial court's denial of his motion to suppress after telling the court that he was pleading guilty to possession of marijuana. The State asserts that because W.D.H. entered his plea before reserving the issue, the issue is not properly before this court. We disagree.
In Ex parte LaPointe, 926 So.2d 1055 (Ala.2005), the defendant did not expressly reserve the right to appeal from the trial court's denial of his application for youthful-offender status until after he had entered his guilty plea. Nonetheless, the Alabama Supreme Court held that the reservation of the issue was valid and that it could consider it, explaining as follows.
"A guilty-plea proceeding is a fluid process, subject to revision and restructuring as matters develop. The trial judge was procedurally at liberty, even if he had not previously been apprised of the reservation feature of the plea bargain, to allow that feature to relate back to the time of the entry of the plea, as a condition to it, so long as this was done before the conclusion of the guilty-plea proceeding. By stating that the guilty plea `is made' on that basis, rather than observing that it `was made,' and expressing his acceptance of that status by commenting `[o]kay,' the trial judge appropriately allowed the necessary reordering of things, with the result that he was able to advise LaPointe that his guilty-plea conviction and sentence were `all subject to the reservation of the right to appeal the youthful-offender [issue].'
"Rule 1.2, Ala. R.Crim. P., admonishes that the rules `shall be construed to secure simplicity in procedure, fairness in administration, and the elimination of unnecessary delay and expense, and to protect the rights of the individual while preserving the public welfare.' The State, in connection with its argument that LaPointe's counsel did not properly *123 preserve the issue of the denial of youthful-offender status for appellate review, also argues that LaPointe has a remedy through Rule 32, Ala. R.Crim. P., because `[i]f the reservation of the issue served as a condition of his guilty plea, a defendant would be able to challenge the voluntariness of his guilty plea in the post-conviction proceeding.' We see no reason to require such procedural circuity and uncertainty of outcome in the face of a record evidencing the trial judge's understanding that LaPointe had properly and timely preserved his right to appeal the youthful-offender issue."
LaPointe, 926 So.2d at 1059-1060.
In this case, the record shows the following discussion between the trial court and W.D.H.'s counsel after W.D.H. had entered his plea of guilty:
"THE COURT: I find that your plea is knowing, it's intelligent and I'll withhold adjudication and sign this order allowing you to apply for drug court.
"MR. HAACK [defense counsel]: And, Judge, we do have one issue to reserve.
"THE COURT: What is that?
"MR. HAACK: The denial of our motion to suppress. And it may become a little issue, Your Honor. We understand.
"THE COURT: Well
"MR. HAACK: I just want to reserve the right.
"THE COURT: It's a legally correct ruling.
"MR. HAACK: Just want to reserve the right, Your Honor.
"THE COURT: All right. Okay. See you then.
"MR. HAACK: Thank you."
(Plea hearing, R. 8-9.)
Just as was the case in LaPointe, the trial court here acquiesced to W.D.H.'s request that an issue be reserved for appeal after W.D.H. had entered his plea, but while the plea hearing was still in progress. Based on the holding and rationale stated in LaPointe, we find that W.D.H.'s reservation of the issue was valid, and we will address it on appeal.
W.D.H. specifically contends that the police did not have the requisite reasonable suspicion to conduct a pat-down search; therefore, he says, the marijuana that he admitted was in his front pocket was improperly seized.
The evidence adduced at the suppression hearing tended to show the following. Detective W.B. Hamil of the Montgomery Police Department narcotics bureau testified that the police had been receiving complaints of a person shooting and selling drugs in a certain block in Tulane Court. He said that the complaints "just accumulated to this day,"[1] when police decided they "need[ed] to go down there and basically find out what's going on and basically walk through the area." (R. 8.) Det. Hamil acknowledged that he did not have a description of any possible suspects.
Det. Hamil said the "whole bureau" went to Tulane Court, arriving about 1:30 p.m. on a Saturday. When they arrived in the area, Det. Hamil said, he approached W.D.H. and two other people who, he said, were sitting down. Det. Hamil said when the three saw the police, they got up and started to walk away, but stopped when asked. Other people who were gathered in the area ran. W.D.H. testified that he was already standing up when police arrived in the area and that he did not attempt to leave.
*124 Det. Hamil said W.D.H. and the other two looked nervous and startled. Det. Hamil said that he did not know specifically what kind of criminal activity may have been taking place, but that "something wasn't right." (R. 13.) He also said that when he approached W.D.H. and the other two males, he did not see any weapons and no one gave any indication that weapons were present. (R. 10.)
Det. Hamil stopped W.D.H. because he looked nervous and he had begun walking away. After stopping W.D.H., Hamil said, he conducted a pat-down search for weapons for his own safety. During the pat-down search, Det. Hamil said he felt a soft bulge in W.D.H.'s pocket. W.D.H. told Det. Hamil, "That ain't nothing but just a little weed." (R. 17.) Det. Hamil removed the packet, which was marijuana. W.D.H. acknowledged that when Det. Hamil patted him down, he admitted to having marijuana in his pocket.
W.D.H. was arrested for possession of marijuana.
"`The trial court held the suppression hearing outside the hearing of the jury; therefore, we review the evidentiary findings of the trial court at that hearing under the ore tenus standard.' Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004). `When evidence is presented ore tenus to the trial court, the court's findings of fact based on that evidence are presumed to be correct,' Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994); `[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,' Bradley v. State, 494 So.2d 750, 761 (Ala.Crim.App. 1985), aff'd, 494 So.2d 772 (Ala.1986); and we make `"all the reasonable inferences and credibility choices supportive of the decision of the trial court."' Kennedy v. State, 640 So.2d 22, 26 (Ala. Crim.App.1993), quoting Bradley, 494 So.2d at 761. `"`Where evidence is presented to the trial court ore tenus in a nonjury case, a presumption of correctness exists as to the court's conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.'"' Ex parte Jackson, 886 So.2d at 159, quoting State v. Hill, 690 So.2d 1201, 1203 (Ala.1996), quoting in turn Ex parte Agee, 669 So.2d 102, 104 (Ala.1995).
"However, `[t]he ore tenus presumption of correctness applies to findings of fact, not to conclusions of law.' City of Russellville Zoning Bd. of Adjustment v. Vernon, 842 So.2d 627, 629 (Ala.2002). `[T]he ore tenus rule does not extend to cloak a trial judge's conclusions of law, or incorrect application of law to the facts, with a presumption of correctness.' Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala.1999). `"`[W]hen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court's judgment.'"' Ex parte Jackson, 886 So.2d at 159, quoting Hill, 690 So.2d at 1203, quoting in turn, Ex parte Agee, 669 So.2d at 104. Thus, we review the trial court's conclusions of law and its application of law to the facts under the de novo standard of review."
Washington v. State, 922 So.2d 145, 157-58 (Ala.Crim.App.2005).
In B.J.C. v. State, 992 So.2d 90, 91 (Ala. Crim.App.2008), this court cited Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254, (2000), in which the United States Supreme Court reiterated the standard to be applied in a "stop and frisk" situation.
"`Our "stop and frisk" decisions begin with Terry v. Ohio, 392 U.S. 1 (1968). This Court held in Terry:

*125 "`"[W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Id., at 30.'"
B.J.C., 992 So.2d at 91.
The circumstances in this case are analogous to those in Ex parte James, 797 So.2d 413 (Ala.2000), in which the Alabama Supreme Court determined that the stop and search of the defendant were unconstitutional. In James, a police officer was patrolling an area known as a high drug-crime area when he noticed a van pulled over on the side of the road. Two or three people outside the van were talking into the van's window, but the officer could not see what, if anything, James, who was driving the van, and the others were doing. Id. at 414.
When the officer approached the van, the people outside the van ran, and James pulled onto the road and drove away. The officer followed the van and pulled it over at a service station. James got out of the van and approached the officer, who asked whether the driver had any weapons. James said that he did not, and the officer replied that he had to conduct a pat-down search anyway for safety reasons. At that time, James reached toward his pocket. The officer tapped James's hand out of the way and reached into the pocket for which James had been reaching. The officer found marijuana cigarettes in the pocket. Id.
In finding that the trial court improperly denied James's motion to suppress because the stop was unconstitutional, the Alabama Supreme Court noted that Terry provides:
"[A] police officer may conduct a brief investigatory stop of a person if the officer has a reasonable suspicion supported by `specific and articuable [sic] facts' that the individual is, or is about to be, involved in criminal activity. The officer may also conduct a patdown search of the outer clothing of the person if the officer `is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others.'"
James, 797 So.2d at 414-15 (emphasis in James), quoting Terry, 392 U.S. at 24, 88 S.Ct. 1868.
The James Court noted that
"`[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a Terry analysis. Adams v. Williams, 407 U.S. 143, 144 and 147-48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

*126 "`In this case, moreover, it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. United States v. Brignoni-Ponce, 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Florida v. Rodriguez, 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (per curiam); United States v. Sokolow, [490 U.S. 1], at 8-9 [109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)]. Headlong flight  wherever it occurs  is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. . . . We conclude Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further.
"`Such a holding is entirely consistent with our decision in Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), where we held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. Id., at 498, 103 S.Ct. 1319. And any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.'
"[Illinois v.] Wardlow, 528 U.S. [119] at 124, 120 S.Ct. [673] at 676 [(2000)] (emphasis added)."
James, 797 So.2d at 416-417.
In determining that the stop of James was unconstitutional and that the motion to suppress should have been granted, the Alabama Supreme Court found that, in leaving the site where he had been talking to others, James "did not go on `headlong flight'" and that driving away could not be deemed unprovoked or unusual. Id. at 417. The court found that had the officer chosen to pursue the other people who ran from the van, the Wardlow rule, cited above, might be applicable, but it was not in James's case. The court also found that, because the officer testified that he did not know what James and the others were doing at the van, and that he did not see the parties exchange anything, he had not legally justifiable reason for stopping James.
Here, Det. Hamil acknowledged that he did not have a description of any possible suspects who may have been involved in the drug activity or shooting reported in Tulane Court. When he arrived at the location, which was on a Saturday afternoon, W.D.H. was one of several people outside. Det. Hamil said that when he saw the police, W.D.H. and others walked off, but W.D.H. stopped when he was asked to by Det. Hamil. Other people ran from the scene, but Hamil did not go after them.
Hamil testified that he thought criminal activity was afoot, but he explicitly said he did not know what kind of activity was wrongful. He based his stop of W.D.H. on the facts that W.D.H. looked nervous and Det. Hamil thought that "something wasn't *127 right," which is clearly not an articulable reason for believing criminal activity is afoot. In addition, Det. Hamil said that when he approached W.D.H. and did the pat-down search, he had no indication that anyone had a weapon.
We find that Det. Hamil had no specific, articulable reason for stopping W.D.H. to conduct a pat-down search pursuant to Terry. W.D.H. was within his rights to walk away when he saw the police on the street, and he stopped when Hamil asked him to. Like James, W.D.H. did not go on a headlong flight. Because there had been reports of shooting in the area over a period of time, an argument could be made that the police acted properly pursuant to a Terry "stop and frisk" when W.D.H. was patted down for a weapon. The United States Supreme Court rejected such an argument in J.L., explaining:
"`A second major argument advanced by Florida and the United States as amicus is, in essence, that the standard Terry analysis should be modified to license a "firearm exception." Under such an exception, a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing. We decline to adopt this position.
"`Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; Terry's rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern. See 392 U.S., at 30. But an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms. Several Courts of Appeals have held it per se foreseeable for people carrying significant amounts of illegal drugs to be carrying guns as well. See, e.g., United States v. Sakyi, 160 F.3d 164, 169 (C.A.4 1998); United States v. Dean, 59 F.3d 1479, 1490, n. 20 (C.A.5 1995); United States v. Odom, 13 F.3d 949, 959 (C.A.6 1994); United States v. Martinez, 958 F.2d 217, 219 (C.A.8 1992). If police officers may properly conduct Terry frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability critical in Adams [v. Williams, 407 U.S. 143 (1972),] and [Alabama v.] White[, 496 U.S. 325 (1990),] the Fourth Amendment is not so easily satisfied. Cf. Richards v. Wisconsin, 520 U.S. 385, 393-394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997) (rejecting a per se exception to the "knock and announce" rule for narcotics cases partly because "the reasons for creating an exception in one category [of Fourth Amendment cases] can, relatively easily, be applied to others," thus allowing the exception to swallow the rule).
"`The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even *128 without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk. Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports, see Florida v. Rodriguez, 469 U.S. 1 (1984) (per curiam), and schools, see New Jersey v. T.L.O., 469 U.S. 325 (1985), cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.
"`Finally, the requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer's prerogative, in accord with Terry, to conduct a protective search of a person who has already been legitimately stopped. We speak in today's decision only of cases in which the officer's authority to make the initial stop is at issue. In that context, we hold that an anonymous tip lacking indicia of reliability of the kind contemplated in Adams and White does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm.'
"Florida v. J.L., 529 U.S. at 269-74 (footnote omitted)."
B.J.C., 992 So.2d at 93-94.
Here, the police had received complaints about drug activity and shooting in a certain neighborhood, but Det. Hamil said he did not have a suspect or a description of a suspect who might have been responsible. Again, there is simply no evidence in the record to support a finding that Det. Hamil had a reasonable suspicion to stop and search W.D.H. Therefore, we hold that the stop and search of W.D.H. were unconstitutional.
Nonetheless, as Det. Hamil was conducting the illegal patdown of W.D.H., W.D.H. volunteered the information that a soft bulge in his pocket was marijuana. The Alabama Supreme Court has recently addressed the admissibility of physical evidence obtained as the result of illegal police action. Ex parte Bridgett, 1 So.3d 1057 (Ala.2008). In Bridgett, the court quoted extensively from an opinion of the United States Court of Appeals for the Eleventh Circuit as follows:
"The United States Court of Appeals for the Eleventh Circuit in United States v. Delancy, 502 F.3d 1297 (11th Cir.2007), has provided a two-part test to assist in the analysis when a consent to search follows illegal police action, stating:
"`Under controlling case law, we are required to conduct two separate inquiries where a consent to search follows prior illegal activity by the police. First, a court must determine whether the consent was voluntary. Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the "fruit of the poisonous tree"  the product of an illegal entry. See United States v. Santa, 236 F.3d 662, 676-77 (11th Cir.2000):
"`"For consent given after an illegal seizure to be valid, the Government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure. Thus, the voluntariness of consent is only a threshold requirement; a voluntary consent to search does not remove the taint of an illegal seizure. Rather, the *129 second requirement focuses on causation: `whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"
"`(quoting Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)) (citations omitted); see also United States v. Ramirez-Chilel, 289 F.3d 744, 752 n. 9 (11th Cir.2002) ("Typically, if the ensuing search occurs after an initial illegality, such as an illegal entry or an illegal arrest, we must first determine whether the consent to search was voluntary and then, whether the consent was tainted by the initial illegality.").
"`This two step approach is mandatory, and the government bears the burden on both issues. See United States v. Robinson, 625 F.2d 1211, 1219 (5th Cir.1980). . . .
"`As the Supreme Court observed long ago, "[w]e need not hold that all evidence is `fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (quotation marks omitted). We are obliged to determine whether the consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion," or, alternatively, whether the causal connection had "become so attenuated as to dissipate the taint." Id. at 486-87, 371 U.S. 471, 83 S.Ct. 407 (quotation marks omitted).
"`This is a fact-specific question, and no single fact is dispositive. See Brown v. Illinois, 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). . . .
"`In Santa, we considered three factors in determining whether a defendant's consent was tainted by his illegal arrest: "[1] the temporal proximity of the seizure and the consent, [2] the presence of intervening circumstances, and, particularly, [3] the purpose and flagrancy of the official misconduct." 236 F.3d at 677.
"`The three factors are not meant to be exhaustive, and commentators have suggested others. See Wayne R. LaFave, Search and Seizure § 8.2(d) (4th ed.2004) (discussing additional factors such as "whether the seizure brought about police observation of the particular object which they sought consent to search, . . . whether the consent was volunteered rather than requested by the detaining officers, whether the arrestee was made fully aware of the fact that he could decline to consent and thus prevent an immediate search of the car or residence, whether there has been a significant intervening event such as presentation of the arrestee to a judicial officer, and whether the police purpose underlying the illegality was to obtain the consent" (footnotes omitted)). Moreover, we will not allow a factor-based analysis to obscure the underlying question, which "generally involves a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response." *130 United States v. Bailey, 691 F.2d 1009, 1013 (11th Cir.1982). Nevertheless, the factors do provide a useful structure. . . .
"`1. Temporal Proximity
"`The time elapsed between the illegal act and a subject's consent to search is obviously relevant. If only a short period of time has passed, a court is more likely to consider the consent as a "poisonous fruit" of the illegal act  that is, that the consent is tainted. Wong Sun provides an illustration of this principle. There, the Court suppressed statements from one defendant when they were given almost immediately after the police broke the door of his apartment, rushed in, and handcuffed him. See Wong Sun, 371 U.S. at 486, 83 S.Ct. 407 ("Six or seven officers had broken the door . . . into the bedroom where his wife and child were sleeping. He had been almost immediately handcuffed and arrested. Under such circumstances it is unreasonable to infer that [his] response was sufficiently an act of free will to purge the primary taint of the unlawful invasion."). By contrast, when another defendant in the same case "had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement, [the Court] h[e]ld that the connection between the arrest and the statement had become so attenuated as to dissipate the taint." Id. at 491, 83 S.Ct. 407, 9 L.Ed.2d 441 (quotation marks omitted).
"`There is no bright-line rule defining the temporal factor. But, if the period of time is extremely short, this factor weighs in favor of exclusion. See, e.g., Santa, 236 F.3d at 666-67, 678 (observing that there had been no "significant lapse of time" in a case where the defendant, handcuffed and lying on the floor, consented to a search just two to three minutes after the police made an illegal forced entry into his home); see also United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir.2003) ("In the present case, there was an extremely close temporal proximity between the illegal stop and Chanthasouxat's consent to the search because the video tape revealed that only three minutes elapsed between the time Officer Carter stopped the van and Chanthasouxat consented to a search."). By contrast, a longer interval obviously weighs in favor of admissibility. See, e.g., Devier v. Zant, 3 F.3d 1445, 1459 (11th Cir.1993) (per curiam) ("Under these circumstances, we must conclude that any taint from his detention on December 2 had been completely attenuated by the time of his eventual confession four days later.").
"`. . . .
"`2. Intervening Circumstances
"`The second factor is the presence of intervening circumstances, or events that interrupt the causal connection between the illegal act and the possibly tainted consent or confession. See Brown, 422 U.S. at 611, 95 S.Ct. 2254 (Powell, J., concurring in part) (characterizing the inquiry as whether "some demonstrably effective break" has occurred); see also Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) (discussing a defendant who was arrested without probable cause "in the hope that something would turn up," and confessed shortly thereafter without any meaningful intervening event); United States v. Edmondson, 791 F.2d 1512, 1516 (11th Cir.1986) (mentioning the defendant's removal from the *131 scene of the arrest as an intervening circumstance).
"`. . . .
"`3. Purpose and Flagrancy of Government Conduct
"`The final factor is the purpose and flagrancy of the official conduct. This factor is also the most straightforward, and . . . the most important one. If the police entry had been made for the purpose of gaining consent to conduct a full-scale search, we would be bound to find the consent tainted. Indeed, when the police act with the express purpose of exploiting an illegal action, the causation is so obvious that no real attenuation analysis is even necessary. See Florida v. Royer, 460 U.S. 491, 505, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (opinion of White, J.) (finding evidence seized after an illegal arrest tainted and omitting the attenuation analysis entirely when the seizure was part of "the officers' attempt to gain [the defendant's] consent to a search of his luggage").'
"502 F.3d at 1308-12 (footnotes omitted).
"This two-step test in Delancy provides a workable means for determining whether evidence seized from a search to which consent is given following prior illegal activity by the police must be excluded as the fruit of a poisonous tree; this Court adopts that test and will now apply it to the facts of this case."
Bridgett, 1 So.3d at 1060-62.
In this case, we will pretermit a discussion as to the voluntariness of W.D.H.'s admission that the bulge in his pocket was marijuana, i.e., whether it was without duress or coercion, because we find that admission to have been the result of exploitation of the illegal search.
The evidence is undisputed that W.D.H.'s admission was made instantaneously with the illegal pat-down search. Thus, the lack of any temporal distance between the search and W.D.H.'s admission weighs in favor of exclusion. Similarly, because W.D.H.'s statement that the bulge in his pocket was marijuana was made during the course of the pat-down search, there were no intervening circumstances that could interrupt the causal connection between the illegal act and the admission.
Based upon the record before us, we cannot say that Det. Hamil's purpose in conducting the pat-down search of W.D.H. was a flagrant attempt to catch W.D.H. with contraband. Det. Hamil testified that the search was conducted for his own safety; however, he also testified that he had no indication that W.D.H. had a weapon.
Det. Hamil's motive in conducting the search is not dispositive of the issue in this case. Based on the application of the test set forth in Delancy and adopted by the Alabama Supreme Court in Bridgett, we find that W.D.H.'s admission that he had marijuana in his pocket was the direct result of the illegal search. As such, the statement was tainted "fruit of the poisonous tree." There is simply no evidence of any intervening circumstance that would attenuate the admission and resulting seizure of the marijuana. Accordingly, W.D.H.'s motion to suppress the marijuana was due to be granted.
For the reasons set forth above, W.D.H.'s conviction is due to be set aside and the cause remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, J., concurs. BASCHAB, P.J., and SHAW and WISE, JJ., concur in the result.
NOTES
[1] The offense occurred on October 19, 2006.